No. 820

First Circuit

---

## VIATOR ET UX. v. TALBOT

---

(October 7, 1931. Opinion and Decree.)
(December 8, 1931. Rehearing Refused.)

---

L. O. Pecot, of Franklin, attorney for plaintiffs, appellants.

Mouton & Davidson and Dan DeBaillon, of Lafayette, and Porteous R. Burke, of New Iberia, attorneys for defendant, appellee.

ELLIOTT, J. An automobile belonging to Rene Viator, while being driven by his son Harold, and in which were riding as his guests C. H. Hagen, Howard Brown, and two young ladies, struck against the corner of a load of lumber which was being carried on a truck belonging to Wilfred J. Talbot, with the result that Harold Viator, Howard Brown, and one of the young ladies in the car were killed.

The truck is spoken of at times as a six wheeled truck; at other times as a truck and trailer. The evidence shows that to a four wheeled truck was attached a two wheeled trailer, making a vehicle with three axles. The load of lumber was carried on a body which was supported by the last two axles.

The body on which was loaded the lumber will be hereinafterwards referred to as the trailer, and the motor part of the vehicle as the truck. The truck belonged to Talbot and was engaged in hauling the lumber for hire from Lafayette to New Iberia. The accident occurred in the parish of Lafayette just east of Broussard on the highway known as the Spanish Trail, during the night of June 25, 1929, about the hour of 1 o'clock a. m.

The plaintiffs, father and mother of Harold Viator, allege that the lumber on defendant's truck had been loaded crosswise, the ends projecting out on each side far beyond the side of the trailer. That the trailer was loaded in a manner violative of Act No. 296 of 1928, particularly sections 37, 45, 46, and other sections of the act, and in utter disregard of the law of the road.

That the driver of defendant's truck was a minor and not a licensed chauffeur; that the unlawful manner in which the trailer was loaded and attached to the

truck, together with the want of care and skill on the part of defendant's employee in driving, constituted negligence, carelessness, and resulted in the automobile, which their son was driving, being struck by the trailer, whereby their son was impaled by the lumber projecting therefrom, causing his death.

They claim of the defendant $2,500 on account of the physical and mental suffering of their son; $2,000 on account of the loss of his companionship, solace, comfort, sorrow, and grief, and $500 on account of medical attention, drug bills, and funeral expenses; a total of $5,000.

Defendant denies being indebted to the plaintiffs on account of their son's death; admits ownership of the truck and trailer, and that it was being driven by his employee from Lafayette in the direction of New Iberia. He avers that plaintiffs' son met his death by no fault of defendant, but through his own gross negligence and want of skill, carelessness, and disregard of the law of the road in driving his automobile.

There was judgment in the lower court in favor of the plaintiffs as prayed for. Defendant has appealed.

The evidence shows that the collision took place at about 1 o'clock a. m. at night, in a curve of the highway just east of Broussard. The curve is spoken of by one witness as a circular curve, but the evidence taken all together shows that it is not circular, but a long gradual curve with an incline to the west, the curve and grade being so gradual that those driving on the road should have no difficulty in keeping on their respective sides of the road at night, under their headlights, as required by law.

The evidence makes no reference to weather conditions as impairing visibility.

Defendant says that his truck was seven feet wide and was loaded with lumber piled crosswise ten feet long. The truck, however, measured about 7 feet 6 inches wide, and the lumber on the trailer was 10 feet and 2½ inches long and loaded crosswise, making its width on the road 10 feet and 2½ inches. The loading was done by the defendant himself. It was completed a little after 12 o'clock at night and started toward New Iberia. The truck was equipped with headlights, the trailer with a tail-light.

The plaintiffs claim that the truck was being driven in the middle of the road, with the load projecting out on the left side about 16 inches beyond the truck, and without the clearance lights provided for by law. The defendant denies that the truck was being driven in the middle of the road and urges that it was being driven on the right side of the road in the direction it was going, and urges that the entire fault for the accident was on plaintiffs' son, the driver of their car. He states in his brief: "We will not trifle with the court by arguing that Mr. Talbot did not violate the law technically speaking—he was very frank with the court and his testimony is sufficient to explain plaintiffs' contention of his negligence in this case. He employed Bernard who had no chauffeur's license. He loaded his truck himself with lumber crosswise ten feet wide, when the law restricted him to eight feet. He had no clearance lights to the side of the truck, as provided by law. These are facts and we admit them."

Defendant contends, however, that his own violations of the law did not cause the death of plaintiffs' son. That the gross

negligence, carelessness, and want of regard, on the part of their son, for the law of the road, was the cause of his own death. That himself and plaintiffs' son both being negligent and at fault, the courts should let them remain as they are.

Defendant's fault was of a very outstanding character, and when the trailer carrying the load of lumber got beyond the center of the left-hand side of the highway in the darkness, going east toward New Iberia, the death or great bodily harm to somebody in an automobile going · west and meeting it was almost bound to very soon occur.

Act No. 296 of 1928, sec. 38 provides:

"No vehicle shall exceed a total outside width, including any load thereon, of eight feet," etc.

Section 50, subsection (e):

"Every motor vehicle * * * having a width at any part in excess of eighty inches shall carry two clearance lamps on the left side of such vehicle, one located at the front and displaying a white light visible under normal atmospheric conditions from a distance of 500 feet to the front of the vehicle, and the other located at the rear of the vehicle and displaying a (yellow or red) light visible under like conditions from a distance of 500 feet to the rear of the vehicle."

Section 13:

"Drivers of vehicles proceeding in opposite directions shall pass each other to the right, each giving to the other at least one-half of the main traveled portion of the roadway as nearly as possible."

It follows from this, that the extreme width permitted under any condition is 96 inches, but defendant so loaded his trailer as to give it a width of 122½ inches, and sent it out on the highway at night, without the clearance lights on the left-hand side, which, under the law, should have been placed there. This load, carried by a moving vehicle on the wrong side of the road, sticking out about 15 inches beyond the width of defendant's truck, created a danger which anybody driving an automobile on the side of the road on which they belonged, meeting it, using ordinary care in the matter· of speed and looking ahead, would almost inevitably run into. Legal provisions of this kind are intended for the safety of people driving on the highways at night, and failure to obey same constitutes negligence per se. As showing the general rule of construction when it comes to statutes and ordinances of this kind, we quote from Cyclopedia of Automobile Law by Blashfield, Vol. 1, subject: Travelers proceeding on opposite courses, sec. 7, pp. 403-4, etc., referred to in plaintiffs' brief:

"A person driving along a highway is not, on meeting a vehicle, obliged to go to the extreme right of the usable road, nor need he turn to the right, so that all of his vehicle is to the right of the center, ·but it is sufficient, if he goes as far to the right as prudence requires, or if he turns far enough, so that a passing vehicle, without turning at all, can pass safely."

Same author, Vol. 2, subject: Rule that violation is negligence per se, sec. 1, pp. 1157-8-9:

"Under the principle that where the law requires some particular thing to be done by a person to guard the personal safety of others, a failure to perform the ·duty so imposed constitutes actionable negligence at the suit of a person of the class intended to be benefited and injured by such failure of duty without contributory negligence on the part of the latter, the rule supported by the great weight of authority is that the violation by the driver of a motor vehicle of traffic regulations of the

state or municipality, so far as they embody express commands governing the use of such vehicles, is negligence per se, which will, if a proximate cause of the injury complained of, constitute a cause of action against the violator or preclude recovery by the violator of damages for such injury; it being understood that by violation is meant an actual one and not a mere technical violation or an act which is justified by the necessities of the case. This rule is particularly applicable to the violation of statutes which makes such violation a penal offense."

Same author, same subject, sec. 6, p. 1168:

"The rule in most jurisdictions is that the violation by the driver of a motor or other vehicle, of a statute or ordinance, in failing to display the lights required by it, is negligence, not merely evidence on which the jury can find negligence. Thus the failure of plaintiff, in an automobile collision in the nighttime, to carry two white headlights, if it so contributed to the collision that the same would not have taken place without it, was in itself enough to preclude recovery by plaintiff regardless of any other matter of negligence."

Numerous decisions of the Courts of Appeal, following the rule established by the Supreme Court, hold that the violation of statutes and ordinances, having such purpose in view, constitutes negligence per se on the part of those who violate them. We cite a few of them. Firemen's Ins. Co. v. Brook Tarpaulin Co., 3 La. App. 502; Roberts v. Eason, 6 La. App. 703; Thornhill v. Yellow Cab Co., 6 La. App. 787; Smith v. Palfrey, 7 La. App. 526. Statutes and ordinances which do not have such a purpose in view are not so construed. Lopes v. Sahuque, 114 La. 1005, 38 So. 810.

In this case, the parties had entered a curve. The law provides on the subject of speed:

"Fifteen miles an hour in traversing or going around curves, or traversing a grade upon a highway, when the driver's view is obstructed within a distance of 100 feet along the highway in the direction he is proceeding."

C. H. Hagen, asked as to the speed of the Viator car at the time in question, says:

"I presume we were going about 40 miles an hour and when Viator saw the approaching lights of the truck, he slowed down and at the time of the collision, was going about 25 or 30 miles per hour."

As heretofore stated, this is a gradual curve, and nothing in the evidence indicates that the view ahead on the part of the driver of defendant's truck or on the part of Harold Viator or the other occupants of his car, while traversing this curve, did not extend along the curve, at the place of impact for a distance of 100 feet ahead, but it appears therefrom that the end of the load of lumber sticking out beyond the side of the trailer which defendant's truck was pulling was not visible as it approached. It was the projecting end of the lumber that struck and killed plaintiffs' son. This lumber was higher from the ground than the wheel, fender, radiator, and hood on the Viator car which was next to it, because the evidence is to the effect that the lumber passed over these parts of the Viator automobile, without coming in contact with them, but when the windshield was reached, it cut through it, bent down the steering wheel, and struck Harold Viator on his breast and head, killing him as well as the young couple who occupied the rumble seat behind him.

C. H. Hagen, who occupied the extreme right-hand side of the front seat of the Viator car, says:

"Q. Please state what part of the car in

128

which you were riding was struck by the truck and describe as nearly as possible the character of the damage done the car you occupied in the collision?

"A. The lumber on the truck nit our car' on the left side, right above the park light and did not scratch either fender, radiator or hood.

"Q. Was the fender and running board on the left hand side or the radiator of the car in which you were driving injured in the collision?

"A. No.

"Q. Was it possible for you to see the lumber and skating rink material on the truck as the same approached you?

"A. It was dark and the lights of the front end of the truck did not show the load behind it.

"Q. Will you state whether in rounding the curve where the accident occurred, Harold Viator's car was kept to one side of the road and if so to which side?

"A. It was kept to the right side of the road.

"Q. Did the truck in approaching give you ample room for passing, or did it crowd you on your side of the road?

"A. It crowded us to our side of the road."

The answer, "it crowded us to our side of the road," taken in connection with the question asked, evidently means that the truck crowded them on their side of the road.

The witness Hagen no doubt felt an interest in the result of the suit, friendly to the plaintiffs, but his evidence is supported and seems worthy of credit. A witness named Beaullieu was at the place where the accident happened next morning at about 9 o'clock a. m.; says that the debris of the wreck was on the left-hand side of the road going east. By debris, he must have had reference to the pieces of glass which had come out of the windshield of the Viator car, because it was broken by the impact of the lumber and produced about all the debris that was found at the

place. The side of the road on which these fragments fell was the side on which the impact took place, and it was on the left-hand side of the center of the road going east, or the right-hand side going west.

Paul Bernard, who was driving the truck, says he was going up the incline of the curve at about ten miles an hour and within about 1½ feet from the ditch on the right side of the road going east, leaving about 20 feet open road to his left which the plaintiffs' car could have used. He contends that the Viator car was being driven on the wrong side of the road. William Martin, with him on the truck, says about the same. Joe Berkley on the truck says that there was plenty of room on the left-hand side of the truck which plaintiffs' car could have used, etc.

As these witnesses were in the service of the defendant, it is probable that they felt an interest in the result, friendly to the defense. The unquestioned statement of Mr. Beaullieu, that the debris was on the left-hand side of the center of the road going east, supported by the testimony of Hagen that the impact took place on the right-hand side of the center of the highway going west must have been believed by the lower court, else he would not have rendered the judgment that he did, and it is felt convincing by us and is accepted accordingly.

The time of night that these young people were on the road and other aspects of the case have received our consideration. But the late hour without some evidence to justify us in so holding cannot be a good reason for deciding that plaintiffs' car was being driven, at the time, at a reckless rate of speed and without care. Some testimony was introduced, the purpose of which was to show that Harold Viator was intoxicated at the time, but the evi-

dence is not sufficient to justify such a conclusion. Having concluded · that the truck was· being driven at the time of the impact on the left-hand side of the center of the highway going east, and that plaintiffs' car was at the same time being driven on the right side of the center going west, it remains to be found whether the occupants of plaintiffs' car should have seen, and therefore must be regarded as having seen, the projecting lumber, coming toward them as they went toward it, in time to have avoided it and to have stopped if by doing so the collision with the lumber could have been avoided.

The occupants of the Viator car had the right to feel as they went forward that the side of the road on which they were was not made dangerous by something that they could not see, with reasonable care, looking ahead under the headlights of their car. But defendant by loading his trailer as he had done, and his driver and employee by driving it on the wrong side of the road, had produced just such a danger. The situation produced was very similar to that which existed in the case Broussard v. Teche Transfer Co., 15 La. App. 439, 132 So. 136, recently decided by this court. It is our conclusion that the projecting lumber was practically invisible to the driver of plaintiffs' car, until it was so close that its discovery and the impact took place about the same instant, and that, on the part of plaintiffs' son, it was unavoidable and made so by the fault and neglect of the defendant and his employee in the way stated.

The judgment appealed from is in our opinion correct.

Judgment affirmed. Defendant and appellant to pay the cost in both courts.