# EAGAN v. STATE

(No. 2227; July 21, 1942; 128 Pac. (2d) 215)

168

170

For the plaintiff in error there was a brief by *E. E. Enterline, Madge Enterline* and *Alex B. King,* all of Casper, and oral argument by *Mr. Enterline.*

172

For the defendant in error, there was a brief by *Ewing T. Kerr*, Attorney General; *H. I. Bacheller*, Deputy Attorney General; and *Arthur Kline*, Assistant Attorney General, all of Cheyenne, and *Vincent Mulvaney* of Casper, and oral argument by *Mr. Mulvaney*.

BLUME, Justice.

## STATEMENT OF FACTS.

On December 11, 1940, at about 9:30 p. m., Dan Eagan killed his wife, Catherine, by shooting her through the neck with a revolver. The place of the homicide was in the basement apartment occupied by the couple at 231 West 12th St., Casper, Wyoming, the house owned by defendant's mother, and the main floor of which was occupied by her. The time was fixed with reasonable certainty, as a physician was upon the scene while the deceased was still living, and she died in his presence. The State charged Eagan with first degree murder. His defense alleged an accidental shooting. The jury found him guilty of murder in the second degree, and judgment was entered accordingly. The defendant has appealed to this court. The testimony is voluminous, and many of the details must be left out. But we have attempted to set out the important and salient points.

Defendant, an attorney at law then engaged in practice at Casper, was thirty years of age, weighed one hundred and ninety-seven pounds. His height is not shown in the record. Deceased was five feet one inch in height, weighed about one hundred and ten pounds. Her age does not appear. She and defendant had been married five years.

There was no eye-witness to the shooting other than the defendant himself. The appended chart, showing the disposition of the furniture in the southwest corner of the apartment, will serve to illustrate certain portions of defendant's testimony:

Defendant testified that on December 11, 1940, he was at his office during the day; that he left there at a quarter to five and went to the Elks Club, where he talked with a number of persons and remained for about half an hour. He then went home. He did not see his wife at that time, but met his mother (who owned the house in which the parties lived, and lived with them) and at her request took her down to the Henning Hotel. He then went back to the Elks, where he talked with the steward of the club, and also talked with a dancing teacher, the conversation with the latter relating to dancing lessons for the defendant's four-year-old daughter and in the course of which arrangements were made for the defendant, his wife and their daughter to visit the dancing teacher the next day. While he was at the Elks, his wife called and asked him to bring home some beer; he bought two bottles of beer and a pint of whiskey and took them home. Upon arrival at home, he had a drink of whiskey and his wife a bottle of beer. He talked with his wife and daughter for about fifteen minutes, and read the paper. When dinner was ready, "we went into the kitchen * * and we either had a drink just before dinner or we had another one during the meal." The defendant, his wife and daughter, and the maid, had dinner together. After dinner, the maid went to a show. Eagan's wife washed the dishes, while he went to his work-shop in the basement to work on a gun-stock. He testified at this point that he had a hobby of guns, had followed the hobby since he was ten years old, owned ten or fifteen guns, and his testimony in general indicates a familiarity with guns, the handling of guns, and to a certain extent, the repair and care of guns. While he was working on the gun-stock, as above mentioned, his daughter was in and out of his work-room a number of times. At about 7:30 defendant's wife came into the work-room, sat on a bench and talked with him for a

time in an apparently amicable conversation. His wife then left, to put their daughter to bed, and later returned to the work-room. She had changed from her regular clothing to her pajamas. She again sat on the bench, and the friendly conversation, covering a number of topics, was resumed. Some time during the evening, the exact time not appearing, she brought the pint of whiskey above mentioned into the gun-room and the evidence is to the effect that the pint was consumed between them during the course of the evening. After a time, the wife left the gun-room and went back into the bedroom of the basement apartment. Defendant finished what he wanted to do that evening and himself went into the bedroom, stopping at his gun-cabinet and taking therefrom the revolver with which the killing was done, and three shells (loaded cartridges) which fitted the gun. "As to the reason I took this gun from the cabinet and the shells—the gun had not been working properly and I had figured all summer that I would fix it, and then, due to one thing and another, I had not gotten around to it, and I had just gotten started on my winter's work, and I picked it up along with the shells, with the idea of seeing if I could find out what was wrong with it." When he took the gun and shells from the cabinet, he went into the bedroom. "I put the shells in the cylinder. I believe it was probably after I sat down. It would be rather unhandy to put them in when you were walking in there. I sat down in an easy chair * *." (the chair marked "A" on the accompanying plat). His wife was either in the room then, or entered immediately after. She got a pillow and laid down in front of the fire. For a time, duration not stated, deceased and defendant talked, he examining the gun and manipulating its mechanism, she lying down in front of the fire. "I had conversation with Catherine after she came into the room. As to what it was about—one thing was about

the gun. I ejected one shell from it to show her that it didn't unload or load like hers. * * * When I ejected the shell from this gun, she was lying down in front of the fire. She was looking at me. * * * * She got up from the pillow and walked over to the radio and turned it on and came back and sat down on the ottoman. She sat on the side of the ottoman towards me, facing towards the radio, in a rather relaxed position. Her feet were bent in under her. She was sitting right in front of me, looking at me, and her legs were bent down. That is a rather low ottoman. She was sitting facing the radio, which was west, and her feet were toward the east. * * * After Catherine sat down on the stool, I had been working the mechanism to see how it was centering, looking down * * * I had to get the gun so I could see down there to see the shine of that cap to see if it was on center, and I turned it a number of times * * * and as I worked to bring it around here in the light, it went off." The witness then put the empty shell in the gun, in the cylinder, and showed the jury what he was doing and what he was doing it for. He continued: "If you pull that around so that you could see that bright cap there, you know the gun is on center. Otherwise, you wouldn't be able to see that cap. That is what I was doing. That is one of the reasons I put the shells in there. * * * When I cocked the gun, I pulled the hammer back, and at the same time I did so I pulled the trigger back. * * I don't know how the gun happened to fire. It all happened so quickly, and, like any accident, it just went off."

While he stated that everything "was confused," he testified that deceased toppled over, evidently backward toward the exerciser. The evidence is fairly satisfactory that after the shot was fired her body or head lay for a moment or so upon the exerciser shown on the plat; here, at the point marked "B" on the plat, was the greatest amount of blood, and the medical experts

testified that the bleeding would be most copious during the few minutes after the shot in which her heart was yet pumping strongly. Defendant testified that he lifted her from this position, saw the wound, and immediately laid her on the floor in front of and with her head toward the stove, in the position in which other witnesses first saw her. He went, then, to the telephone at the top of the basement stairs and called Doctor Henderson, who arrived within ten minutes. The deceased was still living when the doctor arrived; her heart was beating faintly and he administered some adrenalin, but she died "very shortly afterward."

When Doctor Henderson arrived, the four-year-old child was asleep in bed and did not wake up. The defendant was kneeling beside the deceased and begged her to open her eyes. According to the coroner, who arrived shortly thereafter, the defendant was greatly shocked. The gun, when Doctor Henderson came, was lying on the floor. The defendant picked it up, apparently placed it on the table, and somewhat later in the evening, stating that he "couldn't stand it," apparently reached for the gun as though to kill himself, but was prevented by the coroner and officers who had arrived by that time. He answered all questions put to him by the coroner and the officers "promptly and without hesitancy." With some slight variations, he made statements when in the house and later in the evening to the prosecuting attorney (introduced and relied on by the State), as to the manner in which the homicide occurred, and where he and the deceased were sitting, substantially to the same effect as shown by his testimony on the trial. He told the officer Miller that "the damn thing" (the gun) got away from him. This statement was much emphasized in the closing argument to the jury. The officer Carter testified that defendant stated that deceased was "facing him," but what he told the officer Wrobleske corresponded closely to what

defendant testified at the trial. The officer Carter further testified that defendant said that deceased slumped toward him when she was shot, but he had testified at the preliminary examination that he did not tell him how she fell. Moreover, he was not corroborated by officer Miller, who, as Carter stated, heard the same statement. Nor is it probable, in view of the physical facts, that deceased fell toward defendant. The deceased had a slight abrasion, without blood, on the forearm, and on the bridge of her nose. The connection with the homicide, however, was not shown, the physicians testifying that these might have been caused some time previously, and it was further shown that these were not caused by any gun-shot.

A firearms expert in the employ of the Federal Bureau of Investigation testified to a series of tests made with the gun used in this killing, conducting the tests with ammunition of the same type and manufacture as that found in the gun after the shooting. He stated that the tests show that while the weapon was defective, there was "nothing inherent in the design of this type of gun to permit * * a discharge of this firearm without pulling the trigger in the usual manner. * * The gun had three cocks, and occasionally would go off at the half cock. Ordinarily the gun could not be discharged, from the tests, without pulling the trigger at full cock, and with a pressure of 7 to 8 pounds." He testified that the result of a series of tests made to determine the distance the gun was held from the person of the deceased showed that "the gun was held from five to seven inches from the object." The sheriff of Natrona County, corroborating the defendant to that extent, testified that to see whether the gun would center, the best way would be to have the thumb on the hammer and a finger on the trigger. The witness Murray, however, testified that that was not a safe procedure. There was testimony that defendant had

on two previous occasions, when a gun was shown him in a store, stated that it was dangerous to show a gun to anyone with the muzzle pointed toward him.

The bullet struck the deceased in the neck, entering on the left side at a point one and one-half inches below the ear and in "the back third of the neck," i.e., one and one-half inches back of a point directly below the ear. It passed through the neck almost horizontally, striking the first cervical vertebra (the "atlas"), exposing and lacerating the spinal cord, and its course was then deflected slightly downward and it emerged on the right side of the neck at a point in the same plane as the wound of entrance, but slightly lower. The bullet then "entered the right shoulder at approximately the mid-point" and "lodged just inside the shoulder joint." Photographs and X-ray plates, clearly showing the wound of entrance and the course of the bullet, were introduced in evidence, displayed to the jury, and became parts of the record on appeal.

Testimony was introduced to show the conduct of the defendant toward the deceased. It was shown that they were separated for two months between March and May, 1939, but that thereafter became reconciled. In July, 1939, at a picnic, the defendant and a friend were scuffling. That became serious, so that Vince Crater, brother of the deceased, interfered. On the way home, defendant and his wife argued, evidently because of the scuffling; he struck his wife on the head with his hand, and later kicked the back of the front seat of the car several times (she sitting in front and he in the back), so that it knocked her against the windshield and the dashboard. The defendant did not deny this, though he attempted to soften the testimony. A New Year's Eve party, 1939, took place at the Elks Club in Casper. About midnight or a little later the deceased was sitting near the witness Norah Morrisey

near the entrance of the dance hall. The defendant came up, infuriated about something, asked his wife "Where in the hell have you been, you chippy-chasing son of a bitch?" His wife said nothing, and the defendant then said "Say something, you son of a bitch, or I will knock you down." Witness thought that he was going to strike her; she interfered, and he told her that it was a family affair, but turned and went off, the deceased soon following. The defendant denied this occurrence. Dorothy Garland, who was apparently on very intimate terms with the deceased, and to some extent with the defendant, for two years before the homicide herein, and with whom deceased spent most of the day of December 11, 1940, testified to two incidents of difficulties between the defendant and the deceased. One of these incidents was apparently on November 27, 1938, when the baby of Mrs. Garland was christened, the deceased being its god-mother. The witness and her husband, after the christening, went to dinner with the Eagans. After defendant and the husband of the witness had gotten some beer, and came into the house, the defendant, passing the deceased, made some remark to the deceased, and the latter said "Don't be a damn fool," and defendant kicked her on the shin. Deceased said nothing, but rubbed her shin. Witness stated that she and her husband spent a very pleasant evening. The deceased in her diary stated that "all had fun." The second incident related by the witness was in August or July, 1940, at the home of the Eagans, about 8 o'clock in the evening, when defendant came in after horse-back riding. Deceased wanted to go out again, and wanted defendant to take care of the baby. Defendant objected. Later he ordered some beer and a pint of whiskey. When that came, he poured beer for the deceased. She and her husband got into an argument. He put his hands on the neck of the deceased, as to choke her, and shook her. Witness stayed

at the house till one o'clock that night. Defendant took her home, and apologized for his action. The next morning she and the defendant and deceased went out riding and apparently everything was pleasant between defendant and deceased. Witness admitted that she had testified at the preliminary hearing that instead of choking her, he had "threatened to choke her." Defendant, explaining this incident, stated that he shook the deceased, stating that she had been out enough. The witness Agnes Eastman testified that she and the deceased met the defendant on the afternoon of December 4, 1940, at the Royal Cafe. The meeting was apparently so that the deceased might get some money, seemingly because she intended to go to a cocktail party at the Gladstone Hotel. Defendant gave her five dollars. She apparently kidded him about the money, saying that it was not a large amount, and he said "I would just as soon knock you down here as any place." Her gloves fell to the floor and he reached over and picked them up. Defendant stated that both he and the deceased were joking. The witness further testified that on December 10, 1940, the day before deceased was killed, the defendant invited her and the deceased to a drink at the Elk's Club. They went into the cocktail lounge. In talking the subject of Christmas gifts came up, and deceased spoke of the generous gifts which Dr. Kamp (step-father of the defendant) had always made them. Defendant stated, "Well, he won't be buying them this year," (for he had died in the meantime), and he looked at her and said "How would you like a nice fresh divorce for Christmas?" and she said "I would like it." Everything before and after these remarks was pleasant between them. Defendant testified that they were joking.

The witness Emma Hedberg was called for rebuttal by the State. She was the maid employed by Mrs. Kemp during the year 1940, at the home of the Eagans.

She stated that for two or three weeks in February and March, 1940, the defendant and deceased were not on speaking terms and would occasionally have arguments. That in August, 1940, at dinner, Mrs. Eagan made some remarks apparently derogatory to Mrs. Kemp and that the defendant became angry and grabbed her by the arm and twisted it. In September Mrs. Eagan was upset for about two weeks, and some arguments and quarrels occurred. About a week before December 11, 1940, deceased slept with the witness, stating that she did not want to sleep with the defendant that night, and at one time in February told her never to get married. On the evening of December 10, 1940, the deceased was going out to play bridge. Defendant told her not to drink too much. She got angry, and stated that whether one or two drinks were served, she would take them, and he stated, "Katie, I didn't mean it that way." Witness understood that he didn't want her to drink too much. Later Mrs. Eagan cried. Witness stated on direct examination that at times the defendant and deceased were very happy and very affectionate to each other, and then again they weren't. On cross-examination she testified that the defendant would always kiss the deceased when he left for work in the morning, except when she wouldn't let him; that at times deceased would speak to no one, without witness knowing the cause; that except for the little quarrels which defendant and deceased might have had from time to time, the defendant and the deceased were, she thought, a very loving couple.

Testimony on the same subject was introduced on behalf of the defendant. The witness Wickenkamp did painting and other work for about three weeks at the Eagan home in December, 1939, and January, 1940. He testified that during that time he saw the defendant and the deceased every day; that the former would always kiss his wife and his daughter when he left

for work in the morning and when he returned in the evening; that his treatment of her was always kindly; that at one time he saw them come up the stairs arm in arm; that he showed his guns and she did too; that she showed a little pistol and said she liked it; that she picked it up and handled it. The witness Murray, deputy clerk of court, testified that he saw the defendant and the deceased at various times; that their relations were very cordial; that he saw nothing which showed any unfriendly relations. He knew the parties since the fall of 1939, and went shooting with them, when the deceased herself was shooting and handling a gun. After the homicide herein he stated to another person that the defendant must have a dual personality. The witness Bush had known the deceased and the defendant for about six years; they frequently came to his ranch to shoot in the fall of 1940, and at one time Mrs. Eagan shot a duck; that at these times the defendant was kind and respectful toward his wife, and that he never heard an angry word between them. The testimony of Mrs. Bush was similar in effect, and stating that the deceased had told her that she, the deceased, was getting to "be a good shot." Frieda Bailey, a school nurse, testified that she knew the defendant and the deceased intimately for a long time. She saw them at their home about once a week during the year 1940, except when she was in Mexico. She testified that she never heard the defendant say any unkind word to the deceased; that his relations with her were friendly and affectionate; that she had seen her sitting on his lap; that she had seen him stoop over and kiss her, if he would leave the house for anything, and that she had seen her get a light for him, and sit on his knee. The witness Dan Scullen testified that he worked at the Elk's Club; that for about six months prior to December, 1940, the defendant and deceased used to come into the club about five or six times a

month, or oftener, to get a drink; that their relations were friendly, and that he acted as a devoted husband. There was other testimony, including that of the mother of the defendant, as to friendly relations between the defendant and the deceased.

Defendant testified that he and the deceased took numerous fishing trips during 1939, to Deer Creek Park, to Lake De Smet, to Ray's Lake, Ethete Springs, Laramie Plains, and took hunting trips in the fall. Corroboration is found in the diary kept by the deceased, showing numerous photographs taken on these trips. The defendant further testified to numerous fishing trips in the spring and summer of 1940 and hunting trips in the fall. Corroboration is found not only in the testimony of apparently disinterested witnesses, but also in the diaries kept by the deceased in her handwriting. The diaries of 1940, showing the relationship and attitude of the parties, contain the following: Jan 7. Riding, Dan, Pat and me. Jan. 13. Ice skating, Dan, Frank Murray and me. Jan. 14. Ice skating with Dan, Bill C and Whoopi Lindenmeyer. Had a good time. Jan. 28. Dan and I went to mass. Feb. 4. Dan gave me a gardenia. Feb. 14. Dan sent us flowers for our valentine. May 3. Dan's birthday. May 25. May, Dan and I went to Ray's Lake. Got our limit. Had a nice swim at Ethete Springs. May 30. Elks Convention. May, Dan and I went down. April 13. Good time, fishing at Ray's Lake. Tired, but happy. April 20. Fishing at Ray's Lake. June 1. Dan and I went to Big Horns fishing. June 15. Went to Big Horns. June 21. Dan and I went out to Goose Egg, and then over to Riverside. Dan won. July 9. Dan and I cleaned the office after dinner. July 10. Pat, Dan and I had dinner at the Gladstone. August 24. Dan and I sighting his gun. Aug. 25. Dan and I went out. Aug. 29. May, Dan and I went to show in the evening. Sept. 16. Dan, Pat and I went for a little walk in eve. Oct. 1.

Dan and I went hunting. Oct. 5. Dan and I hunting. Oct. 21. Dan around home. Oct. 22. Dan and I went to show. Oct. 24. Dan and I went to Policemen's Ball at Elks. Had a good time. Oct. 29. Dan and I cleaned office. Oct. 31. Dan and I hunting. 12 midnight. Nov. 1. Arrived home 5 p. m. Didn't get deer. Nov. 23. With Dan hunting. Nov. 30. Went out shooting. Dec. 7. Dinner with Dan. In January, 1940, the defendant and deceased took a trip for about a month to Mexico and California. This, too, finds corroboration in the diary of the deceased. Some other facts will be mentioned in the course of the opinion herein.

## OPINION.

■ The defendant contends that the court erred in giving instruction numbered fourteen, reading as follows:

"You are instructed that the defendant, having contended and testified that the shot which caused the death of the decedent was fired accidentally, the burden is upon the state to prove the contrary. And unless you are convinced by the evidence beyond all reasonable doubt that the defendant fired the fatal shot intentionally and with the purpose of killing the decedent you must find him not guilty of either murder in the first degree or in the second degree."

Objections are urged against this instruction. First, it is argued that it is erroneous in that it told the jury that they could find the defendant guilty of murder in the second degree though committed without malice. While the instruction on the point here under consideration is incomplete, it can hardly be denied that it was correct in telling the jury that they should not convict of murder in the first or second degree, unless it was committed "intentionally and with the purpose of killing." Without that intent and purpose, conviction of murder in these degrees could not be had, just

as the instruction states. The fact that another element, that of malice, is also necessary, does not take away the truth of that fact. If the instruction stood alone, and the court had given none concerning the requisite of malice, the instruction might be considered harmful. But that is not true. The point of malice was fully and completely covered by instructions 8 to 11 both inclusive. The instruction deals with accidental death, and the court evidently considered that in the popular sense of that term (as we shall generally use it in this opinion), though that, as shown below, is not the legal definition thereof. If the homicide was accidental, it was not intentional, and the reverse is true, and that is the thought intended to be conveyed to the jury, and considering "accidental" in the popular sense, the instruction was not erroneous, so far as it went. In the second place, it is contended that the court, by this instruction, instead of telling the jury that if the act was not committed intentionally, they could not convict the defendant of murder, it should have told them that they should, in such event, acquit him. An instruction to that effect was asked but not given. In some cases, doubtless, such instruction would be proper. But it would have been erroneous under the evidence in this case. It does not follow that, because the homicide was not committed intentionally, the defendant was entitled to an acquittal, as contended. Under the evidence, the element of exercise of care enters into this case. "The taking of human life by accident, misadventure, or misfortune, while in the performance of a lawful act, exercising due care, and without harmful intent, is excusable; but all such facts must concur, and the absence of any one of them will involve guilt. The homicide must have been committed while the accused was engaged in doing a lawful act, and by lawful means, with ordinary and reasonable care, and without any unlawful or harmful intent.

Gross negligence, even in the performance of a lawful act, may render the defendant liable." Warren on Homicide, Permanent Edition, Sec. 164; 30 C. J. 87-88. And that corresponds with our statute, which, in Sec. 32-205, Rev. St. 1931, defining manslaughter, states that "whoever unlawfully kills any human being without malice expressed or implied, either voluntarily upon a sudden heat of passion, or involuntarily, but in the commission of some lawful act, or by any culpable neglect or criminal carelessness, is guilty of manslaughter."

It is, however, further contended that the defendant was deprived of the defense of accident. Warren on Homicide, supra, section 342, states the rule as follows:

"Where the theory of the defendant is that the killing or assault was the result of accident or misfortune, and was unintentional, and such theory finds support in the evidence, it is the duty of the court to instruct fully and clearly as to the law relating to accident or misfortune. Such an instruction is, however, unnecessary and properly refused in the absence of evidence tending to show accident or misfortune."

See also 30 C. J. 364-366.

Assuming the first sentence of the instruction given to be correct, since there is no controversy concerning it, an instruction on accidental death would have been complete under the evidence in this case, by adding in substance that, if the jury found that the homicide was accidental, they should acquit the defendant; that under the evidence in this case, in order to constitute an accident, it must have been neither intentional nor by criminal negligence; and by adding to the last part of the instruction given the further sentence to the effect that unless the jury found beyond a reasonable doubt that the homicide was committed by criminal negligence, they should acquit the defendant. That would have contained a definition of accident as appli-

cable under the testimony in this case. No instruction defining accident was asked, and we are not prepared to say that in view of that it was erroneous not to give such definition. And the portion above mentioned relating to criminal negligence was given substantially by the court in instruction numbered thirteen reading as follows:

"You are further instructed that to warrant a conviction of involuntary manslaughter in this case, the state must prove that the defendant involuntarily, that is, unintentionally, killed the deceased by culpable negligence or criminal carelessness as elsewhere in these instructions defined. If these facts are not proven by the evidence beyond a reasonable doubt, you cannot find the defendant guilty of involuntary manslaughter."

In another instruction, the court defined culpable negligence or criminal carelessness. In other words, the substance of the court's instructions on the point here discussed was this: The State must prove that the homicide was not committed accidentally, and unless the jury found beyond a reasonable doubt that it was committed intentionally or by criminal carelessness, they should acquit the defendant. We are inclined to think that, taking both instructions together, the defendant was not deprived of the defense of accidental killing.

■ Exception is taken to instruction number 15, given by the court in the following words:

"Evidence has been introduced by the prosecution of difficulty between decedent and the defendant on different occasions before the fatal shooting. Such evidence has been admitted, not as evidence that defendant committed the crime charged, but only as evidence of a motive for the crime charged and as bearing upon the question of malice at the time of the shooting. The weight of such evidence is for you to determine. Testimony of this character does not constitute evidence of malice at the time of the discharge of the gun resulting in decedent's death unless you believe that it tends to

prove a continuing course of conduct up to the time of the fatal shooting. If you believe from the evidence that on the night of the fatal shooting all previous trouble between decedent and defendant had been forgiven and forgotten and that a happy relationship existed between them at that time, then you should entirely disregard all evidence of previous difficulty between them."

It is contended that the instruction assumes the evidence on the point mentioned therein as true. We do not think that to be true. The instruction itself states that the weight of the testimony is for the jury, and in another instruction the court told the jury that the credibility of the witnesses was for them. Again, it is argued that incidents in married life might be forgiven, but they would not be *forgotten*. Of course, the court used merely a commonly understood expression, and it was harmless. Again it is argued, that the court entirely ignored the testimony of the defendant on the point mentioned therein. We might say that instruction No. B offered by the defendant on the same point does likewise. We do not think that the instruction given was prejudicial.

■ Complaint is made because the trial court admitted in evidence photographs taken of the furniture in the room where the deceased was killed, and photographs of the deceased lying on the floor and in other positions, one of them showing the powder marks made by the shooting. Most of the photographs have been of assistance to us, and they were, doubtless, of some assistance to the jury. One of the photographs of the decedent, Exhibit 4, according to Dr. Henderson, showed correctly the point of entrance and exit of the bullet. It, on the whole, gives, perhaps, a wrong impression of the whole course of the bullet. Another exhibit, No. 3, however, gives the correct course. We do not think that any prejudice to the defendant re-

sulted from the introduction in evidence of any of the photographs.

■ It is argued that the court erred in admitting the testimony of the witness Crater, brother of the deceased, that she had a holy terror of fire-arms. However, other testimony similar in effect was admitted without objection, so that we cannot say that it was prejudicial error to admit the testimony of the witness Crater—without deciding whether it would have otherwise been proper.

■ The witness Allen was permitted to answer that it was not safe practice for anyone to handle a loaded gun with anyone else in front of him. It is claimed that this was an invasion of the province of the jury. Perhaps so, but the witness merely stated what everyone knows, and what each of the jury knew. There was no prejudice in this respect.

■ The witness Emma Hedberg, maid in the Eagan home, was called in rebuttal and testified, as above shown, to certain incidents in the relation of the defendant and the deceased. Objection was raised at the trial, and is now, that her testimony was not rebuttal testimony. Most if not all of the testimony was, perhaps, not rebuttal testimony. However, aside from the fact that the order of introduction of testimony is largely in the discretion of the trial court, the testimony of this witness was, on the whole, more favorable to the defendant than otherwise, so that we do not think that he was prejudiced.

■ The deceased kept a diary during the years 1939 and 1940, not complete, but containing many entries having a tendency to show to some extent the relations existing between the defendant and his wife, or their attitude toward each other. The court admitted some, but excluded others. The diaries were marked as Exhibits F and G. Part of the entries in the former

exhibit were written on the typewriter, and the court excluded these as not having been properly identified. We have examined the entries excluded, and do not think them of sufficient importance so that their exclusion was prejudicial. All the entries in Exhibit G were, as shown, in the handwriting, in pencil, of the deceased. Only part of the entries offered were admitted. A number of others might well have been admitted, and were probably not admitted because they were overlooked in the hurry of the trial. However, they were but cumulative evidence in character, and the exclusion would not constitute sufficient ground for reversal. We have, however, in the statement of facts included a number of entries not admitted in evidence, so that their effect may be judged along with the others.

■ It is contended that the closing argument to the jury by the prosecuting attorney of Natrona County was highly prejudicial to the defendant by reason of misstatements. No exceptions were taken to the argument, but it is contended that the court should nevertheless have interfered. The prosecuting attorney, for instance, twice made the statement that the burden to prove that the homicide was an accident was upon the defendant. The court had instructed to the contrary, and that, whether correct or not, was the law of the case. While, accordingly, the statements of the prosecuting attorney were wrong, still, we have no reason to think that the jury would accept them as true, when the court had instructed otherwise. Vigorous objections are raised to the theory of the prosecuting attorney advanced in his argument before the jury as to the manner in which the homicide occurred, contending that the shot was fired while the defendant was standing and the deceased was asleep, and that this is the most logical explanation of the course of the bullet. While his theory may be entirely wrong, and even against some of the testimony in the case, still we do

not see why he should not be permitted to argue it. The manner in which the homicide occurred is not clear. We are not as certain as counsel for the defendant, on the question of the course of the bullet. We ourselves have been compelled to theorize—to try to find some explanation, and we do not see why the prosecuting attorney did not have the same right. We do not think that he went beyond the bounds of reason. Other objections to his arguments have been advanced. We shall not mention the details. We have read the whole argument in the record. It appears, on the whole, to be a calm, dispassionate statement of what he conceived to be the facts in the case. It was not in any sense inflammatory, so far as we can see. Some leeway must be given to the prosecuting attorney. We do not think that any reversible error has been shown in this connection.

■ It is contended that the evidence is not sufficient to sustain the verdict herein, particularly in that it is insufficient to show malice. That is the important question in this case. The rules of law applicable in that connection seem to be fairly well settled. If there is a reasonable doubt as to the higher or lesser crime, the jury should convict him of the lesser. 30 C. J. 312; 23 C. J. S. 206. It has been held that it is proper to charge the jury that they should acquit if the conduct of the defendant on a reasonable hypothesis is consistent with innocence. 23 C. J. S. 851. It would seem to follow that if the evidence is as consistent with guilt of a lesser crime as it is with the guilt of a higher, the conviction should be of the lesser. If the facts and circumstances of the homicide appear, malice is inferred, not from the use of a deadly weapon alone, but from all of the facts and circumstances so shown. Trumble v. Territory, 3 Wyo. 280; Kenniston v. State, 80 Nebr. 688, 115 N. W. 289; Runyan v. State, 116 Nebr. 191, 216 N. W. 656; Raines v. State, 81 Miss.

489, 499, 33 So. 191; State v. Cross, 42 W. Va. 253, 24 S. W. 996; Smith v. State, 161 Miss. 430, 137 So. 86; Wigmore, Ev. (3rd Ed.) Sec. 2511 and cases cited. The rule applies where the state relies, as in the case at bar, on the statement or evidence of the defendant to establish one of the necessary elements of the crime charged. In such case the admission of homicide must be considered in connection with any mitigating or exculpatory statements made in connection therewith. Thus in Wall v. State, 5 Ga. App. 305, 63 S. E. 27, the court stated in part:

"Ordinarily the jury, in considering an admission which is partly inculpatory and partly exculpatory, may believe it in part and disbelieve it in part. * * * However, where the state must rely upon the defendant's admission alone for essential elements of its case, the rule does not apply to the extent that a verbal segregation of what the defendant said is to be permitted. 'If the main fact is admitted with a qualifying exclusion of a necessary ingredient of the crime charged, the crime is not confessed. The qualification is a part of the admission and both must be considered in interpreting the meaning of the statement. It would be manifestly unfair to hold a person criminally bound by a statement which admits the commission of the act and in the same breath legally justifies the same.' "

The court quotes from Owens v. State, 120 Ga. 297, 299, 48 S. E. 21, where the court further stated that "if at the time of the admission of homicide the admission is justified, such qualification of the admission of the homicide robs it of the vital element of murder." In Futch v. State, 90 Ga. 473, 16 S. E. 102, the trial court charged the jury that when a person admits a homicide, the law presumes that homicide to be murder. The court, holding this to be error, stated in part:

"In his statement to the jury, the accused admitted that he killed the deceased intentionally and with a deadly weapon, but as we have seen, this admission was accompanied by an explanation which, if true,

would negative malice. While such an admission, without any explanation as to why the killing was done, would give rise to a presumption of malice, no such presumption could be drawn from a statement which admits but at the same time justifies the act. That part of the statement which, if unexplained, would criminate, although it could be received as evidence of the fact it admitted, could not, to the exclusion of another part which qualified and explained it, create a presumption that accused was actuated by malice and was guilty of murder."

See also Green v. State, 124 Ga. 343, 52 S. E. 431; Miller v. State, 184 Ga. 336, 191 S. E. 115; Frazier v. Com. (Ky.) 114 S. W. 239; Surles v. State, 148 Ga. 537, 97 S. E. 538. We might say, incidentally, that the intent to kill is, in this case, closely connected with that of malice; they are hardly separable in view of the claim that the gun was discharged accidentally. The same rule above mentioned in connection with malice would probably apply to intent. See Underhill, Criminal Evidence, (4th ed.) Sec. 555; Warren on Homicide, Perm, Ed. Sec. 129; 29 C. J. 1101. Again, while the jury are ordinarily the sole judges of the credibility of witnesses, the rule has its limitations, and many cases have announced modifications thereof, the composite of which seems to be substantially as follows: Where an accused is the sole witness of a transaction charged as a crime, as in the case at bar, his testimony cannot be arbitrarily rejected, and if his credibility has not been impeached, and his testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted. McDowell v. State, 238 Ala. 482, 191 So. 894; State v. Hurst, 93 W. Va. 222, 116 S. E. 248; State v. Galford, 87 W. Va. 358, 105 S. E. 237; Houston v. State, 117 Miss. 311; U. S. v. Salamat, 36 Phillip 842; U. S. v. Dinola, 37 Phillip 797; Martin v. State, 141 Miss. 124, 106 So. 270; Spratley v. Com., 154 Va. 854,

152 S. E. 365; Hawkins v. Com., 160 Va. 395, 169 S. E. 558; Fairfax v. Com., 177 Va. 824, 13 S. E. (2d) 315; Thomason v. Com., 178 Va. 489, 17 S. E. (2d) 374; McHigh v. State, 241 Ala. App. 569, 3 So. (2d) 569; Bowen v. State, 164 Miss. 275, 144 So. 230; Russell v. State, 91 Fla. 370, 107 So. 922; Patty v. State, 126 Miss. 94, 88 So. 498; Holton v. State, 87 Fla. 65, 99 So. 244; Underhill, Criminal Evidence, (4th ed.) Sec. 136. In Patty v. State, supra, the court stated:

"As we view the evidence in this case, there is no positive contradiction of the defendant's evidence as to how the difficulty occurred. All the facts may be explained on a theory consistent with the evidence for the defendant. * * * Taking the evidence for the defendant as being true, and we think it must be so taken, the killing was justifiable."

In Bowen v. State, supra, the court stated:

"The explanation given by the appellant is not contradicted, either directly, or by fair inference from the testimony. It must therefore be accepted as disclosing the true facts."

In Spratley v. Com., supra, the court stated:

"While the jury is the judge of both the weight of the testimony and the credibility of witnesses, it may not arbitrarily or without any justification therefor give no weight to material evidence, which is uncontradicted and is not inconsistent with any other evidence in the case, or refuse to credit the uncontradicted testimony of a witness, even though he be the accused, whose credibility has not been impeached, whose testimony is not either in and of itself, or, when viewed in the light of all the other evidence in the case, unreasonable or improbable, and is not inconsistent with any fact or circumstance to which there is testimony or of which there is evidence. There must be something to justify the jury in not crediting and in disregarding the testimony of the accused other than the mere fact that he is the accused or one of them."

In Houston v. State, supra, the court stated:

"We are fully conscious of the rule as stated in Wingo v. State, 91 Miss. 865, 45 So. 862, that 'the jury is under no compulsion to implicitly believe all the statements of a party, acknowledging the killing of a deceased person;' nevertheless there must be physical facts or circumstances inconsistent with the statements or testimony of the accused. * * * Her testimony, unless materially contradicted by the physical facts, should not be utterly ignored."

And the court held that a peremptory instruction of acquittal should have been given.

In U. S. v. Dinola, the court stated: "Where the evidence in a cause for homicide is the uncontradicted testimony of the defendant, and the facts declared by him are likely, they should be accepted." In McDowell v. State, supra, the court, on second rehearing, stated: "The law which permits the defendant to testify, and permits the defendant's wife to testify in his behalf, is a recognition of the fact that their testimony cannot be capriciously disregarded because of interest in the result. It must manifest other infirmities, which when considered with such interest, renders it unworthy of belief." In Martin v. State, supra, the court stated: "There was no one except the appellant who could testify as to the acts, conduct and demonstration of the deceased just before and at the time of the fatal shooting, and there are no physical facts or circumstances in evidence which contradict his version of the affair in any material particulars. On the contrary the physical facts tend to corroborate the appellant, and we see nothing in the entire evidence that would justify the jury in rejecting his testimony.

In Miller v. State, 191 Wisc. 177, 211 N. W. 278, a case not involving a homicide but a liquor transaction, and in which Butler, one of the defendants, was the

only person having any knowledge of the crime charged, the court stated:

"It is conceded that juries are not bound to accept as true the testimony of any witness, but when testimony is rejected there must remain sufficient evidence to sustain a conviction beyond a reasonable doubt. If Butler's testimony is rejected, there does not remain proof of guilt beyond a reasonable doubt. But the jury had no right to reject Butler's testimony. His explanation * * * is not so improbable as to be discredited on that account, and there is not a syllable of testimony to contradict him. In such case there should be no conviction. There may be a strong suspicion of guilt, but no matter how strong the suspicion may be, it is only suspicion, and convictions cannot be had upon mere suspicions. It is unfortunate if a guilty man escape for lack of evidence, but it is not nearly so unfortunate as to permit an innocent man to be convicted upon suspicion."

What is here stated as to "innocence" would be equally applicable to innocence of a higher degree of crime. Whether or not the rule here discussed should be the rule in a case in which an intentionally homicide is admitted or proven, we need not decide.

■ We turn then to consider the facts and circumstances immediately connected with the homicide, in the light of these rules of law. It may be that the full truth still lies hidden within the breast of the defendant alone. But we cannot indulge in pure speculation, and must do the best we can with the record before us. Defendant testified that he sat on a chair, with his wife in front of him on a stool; that he was fooling with the revolver and that it was accidentally discharged. The State disputes that. Its theory, while not shown in its brief herein, appears to be, as shown by the closing argument to the jury, mainly, apparently on account of the course of the bullet, that the deceased was lying on the floor with her feet toward the gas heater, with her right shoulder resting on the footstool

(ottoman) ; that she was asleep; that the defendant was in a standing position when he shot her, and that the deceased, in the throes of death, threw her head to the right toward the exerciser, accounting for the largest amount of blood at that place. The State further appears to argue that the jury had the right to find the correctness of the foregoing theory from the mere fact that at some time during the evening, according to the defendant's testimony, she was lying on the floor, to warm her feet and back. If the theory is correct, it must be gathered from all the facts and circumstances, and if correct, the verdict should stand. In fact, in such case, the jury should have returned a verdict of murder in the first degree, and that they had some doubt as to the correctness of the theory is shown by the verdict returned herein. Even the prosecuting attorney was not absolutely certain of his ground, asserting in his closing argument to the jury that it was not incumbent on the state to show how the homicide occurred, but that it was incumbent on the defendant to show that it was an accident. It is the contention of counsel for the defendant that the course of the bullet is entirely consistent with the explanation given by the defendant; that the deceased, according to the defendant's testimony, was sitting side-ways toward the radio, in a relaxed position, and that she toppled over, when shot, toward the exerciser. Much as we have theorized on the question of the course of the bullet, we have not been able to come to a definite conclusion, though that is not, perhaps, surprising, if the homicide was in fact accidental, as the defendant claimed. The testimony that the deceased was sitting on the stool, in front of defendant, and toppled over (evidently toward the exerciser), is not unreasonable. In fact it is corroborated by the testimony of Dr. Riach,

who testified that if the theory of the state were true, the largest amount of blood should have been found on the foot-stool, and that the tendency would have been to "slam her down tighter on the ottoman rather than to have shoved her off of it." The testimony was not contradicted.

It was shown that the defendant's right thumb was out of joint, making it not unlikely to weaken it in holding the hammer of the gun, hence perhaps contributing to the accidental discharge of it. It appears that Dr. Henderson examined the thumb some time in November, 1940, when it was swollen, so that the claim is not altogether without support. The prosecuting attorney argued to the jury that since defendant had knowledge of this condition at the time of the homicide, it was criminal to handle the gun the way he claimed. That must be conceded, particularly in view of his knowledge of firearms, but it does not necessarily show an intent to kill, and is not, we think, inconsistent with the claim of accident (in the popular sense of that term). A striking fact herein is the place where the deceased was shot. If the bullet had entered the neck a fraction of an inch farther back, it would, in all probability, have caused but a flesh wound, not fatal. It would seem that if the defendant had intended to kill the deceased, he would never have taken the chance of shooting her in the place where she was shot, but would have selected a surer place. Excluding possibilities, this fact would seem to show the State's theory to be wrong. Another circumstance seems to have considerable bearing herein, which is mentioned neither in the brief of the State nor of the defendant, and which was not mentioned in the closing argument to the jury. The defendant testified, or stated in his previous examinations, that he bought two bottles of beer and a pint

of whiskey shortly before six o'clock of the evening of December 11, the time of the homicide; and that that was consumed during the evening. The testimony is not in any way questioned. If it had not been true, it would seem that the contrary might have been easily shown. The testimony shows that defendant's wife drank a bottle of beer, and that defendant himself took a drink of whiskey; that later, either immediately before, or during the dinner, about six o'clock, both had another drink, and while the testimony does not show it, it is probable that she took the second bottle of beer. The remainder was consumed later in the evening. A pint of whiskey contains 12 good drinks, served in the usual (and not a small) whiskey glass. Accordingly, ten drinks were left in the bottle after dinner-time. The exact time when the parties commenced to consume this was not shown, except that it was after 7:30. Judging from the usual conduct of men, they probably did not commence to drink until 8 or 8:30 that evening. If they divided it equally each consumed five good drinks of whiskey in the course of an hour or an hour and a half. The defendant probably took more than his share. While it is a well-known fact that some people can drink more than others, it is wholly improbable that the amount consumed by the defendant did not materially contribute to his inability to handle the revolver safely. Furthermore, the evidence shows that the defendant called Dr. Henderson immediately and that he answered all questions soon after the homicide without hesitancy. The acts may have been pre-arranged, but there is at least a doubt as to that. And he knelt by the side of his wife, and appeared to be shocked. It is possible, of course, that this behavior and appearance was simulated, but it seems the natural sequence of an unexpected tragedy. See Wigmore, Evi-

dence (3rd ed.) Section 293, 1144. And considering all of the foregoing facts and circumstances as a whole, they do not, it would seem, show the falsity or inconsistency of the defendant's claim, but would rather seem to be consistent therewith.

That leaves for consideration the conduct of the defendant toward the deceased. If the defendant is guilty of murder, we ought to be able to find a motive. Motive, it is true, is not essential, (30 C. J. 179; Underhill, supra, Sec. 559), but it would seem that the absence in this case should have considerable influence in determining the degree of guilt. Malice is essential; it must be shown beyond a reasonable doubt, and as stated in State v. Sorrentino, 31 Wyo. 129, 139, 224 Pac. 420, 34 A. L. R. 1477, the term "implies a wicked condition of mind while the homicide is committed; a mind, we may say, committing the very act willfully." And it would seem, in view of the fact that the relationship between the defendant and deceased was laid bare, we should be able to find malice therefrom, if it was present in this case. The contention that the defendant is guilty of murder seems to sum up in this: that he wanted to get rid of his wife. When the point at issue is stated thus, we can, we think, perceive the probative effect of the testimony to be now considered more clearly. Malice was attempted to be shown by introducing testimony of previous quarrels and difficulties between defendant and deceased. We may concede that they were all competent to be shown, but the probative effect thereof must be determined from all the facts and circumstances shown in the case. State v. Joy, 315 Mo. 14. These difficulties would have shown motive, and perhaps malice, if the deceased had killed the defendant, but the reverse is not so clear. It was shown that the parties separated for two months in the

early part of 1939 from March to May, and then became reconciled. Instead of showing malice and motive, and intent to kill, the reverse would seem to be true, for the reconciliation was voluntary and apparently gladly made by the defendant, as well as deceased. It was shown that some time in 1939 the defendant slapped his wife, with others present. For a man to slap a woman, let alone his wife, is not permissible under the spirit of American chivalry, and this fact, stressed in the argument to the jury, had undoubtedly much to do in bringing about the verdict in this case. But of course, to slap her, even with malice, is one thing; to kill her with malice is another. It may not be inappropriate at this place to refer to the case of Raines v. State, 81 Miss. 489, where it appears that the defendant had killed his wife and claimed it to have been accidental. Testimony showing difficulties over a number of years previously had been introduced to show malice. The court stated among other things: "We further think that the many simple assaults of the deceased by the defendant, whether collectively or separately considered, were incompetent as evidence against the defendant, and were hurtful and injurious to his side of the question then under investigation by the jury * * * and we are at an utter loss to see how his chiding declaration to his wife, made while drinking, though only three weeks before the awful tragedy, that he would divorce her because she would not dress up, could be put in the balance against the liberty and life of the defendant."

The incident on New Year's Eve of 1939 is, perhaps, the worst and most inexcusable incident shown in the record, illustrating the conduct of the defendant. He denied it, but we have no reason to think that the testimony of the witness Morrisey is not true. While the

testimony does not show it, judging from the drinking habits of the defendant, the occasion, and the fact that intoxicating liquors were served at the place, we have no doubt that he was drunk. Even then, the testimony would be of probative effect, if followed by similar conduct. The facts relating to the "choking incident" were not well presented. The specific acts of the defendant are not shown, and the threat to choke as testified to by the witness at the preliminary examination had become "choking" at the trial to the jury. That and the other incidents shown by the State, to illustrate the conduct of the defendant toward the deceased, were, as indicated by the Georgia case last cited, regrettable though they were, of minor character, hardly sufficient to show that the defendant wanted to get rid of his wife. Particularly is that true in the light of all the facts shown herein. It is, for instance, not surprising that he got angry when his wife made a statement derogatory to his mother. It is altogether probable that the defendant was right in stating that he and his wife were joking when on December 4, 1940, he gave her five dollars, and she kidded him about that not being much, and he stated he would just as soon knock her down there as any place—crude though his statement naturally sounds to others. And that was true, we think, in connection with the incident of December 10, 1940, when he asked how she would like a nice fresh divorce, and she stated "I would like it." If, perchance, it were to be considered as serious, it would show, we think, the contrary of what the state contends. If he wanted to get rid of her, and he was able to do so by a divorce, with her consent, as the statement implied, it seems hardly credible that, instead, he would resort to murder. Divorces are frequent and comparatively easily obtained under the laws of this state, leaving

little room for the desire or necessity for murder where both parties consent. The witness Hedberg, testifying that ordinarily the defendant and the deceased were very affectionate toward each other, was able to relate but a few minor incidents of a disagreeable nature during the course of a whole year. If any one at all, she should have been able to show that the defendant's conduct was such that he wanted to get rid of his wife. Her testimony, we think, shows the contrary. She testified, for instance, that on the evening before the homicide, defendant asked his wife, as she was going out, not to drink too much. She became angry, as she naturally would, stating that she would drink one or two drinks, if served, and he then stated, "Katie, I didn't mean it that way." That statement would seem far from indicating murder in his heart, but would seem to show, on the contrary, a solicitude on his part, that she should not become angry. Nor can we overlook the testimony of apparently disinterested witnesses for the defendant. The witness Murray, for instance, was so impressed with the affectionate conduct of the defendant toward his wife that, when he heard of the homicide, he stated that the defendant must have a dual personality. We may glean some kernels of truth from the diaries of deceased. The various and numerous trips, including the trip to Mexico and fishing trips, which the defendant and deceased took both in 1939 and in 1940, show that their relations were reasonably pleasant, although, as the defendant himself admitted, they did not always get along well together. The relationship, too, is shown by the hunting trips which they took together. These frequent hunting trips in the fall of 1940 are shown, not alone by the testimony of the defendant, but also by apparently disinterested witnesses and by the diary of the

deceased. The last one was on November 30, 1940, just a few days before the homicide. They show that the state has perhaps exaggerated the fear of the deceased of guns, although it may well be true, that the year previously, as indicated, for instance, by the testimony of the witness Fern Huber, the fear existed to a greater extent than in the fall of 1940. These hunting trips, moreover, would seem to have afforded a much better opportunity for killing her and for a claim that it was accident, than to kill her in the house and make that claim. About 5:30 of the evening of the homicide, he made an arrangement that he and his wife would take their little daughter, four years old, to a dancing school the next day. That is shown not only by defendant's testimony, but also by that of Dorothy Artist, dancing teacher, who had a class of ten children 3 and 4 years old, and who apparently was an entirely disinterested witness. It seems impossible to believe that within about four hours after this arrangement, he would intentionally and maliciously kill his wife, unless, perchance, something suddenly arose which caused him to kill her in the heat of passion. There is no evidence to that effect; it is not the State's theory, and we shall not indulge in that speculation. Furthermore, there is not the slightest indication in the record that there was "another woman" in the case, which might have given the defendant a motive for killing his wife and getting rid of her. Neither is there any indication that defendant was jealous or had cause to be jealous of any relations of deceased with other men, or that, after the reconciliation, he had any fear or cause to fear that deceased would leave him, which might have influenced him in the commission of a crime. Defendant and deceased had a little daughter, of whom defendant was very fond. He knew that she needed a mother, which

would have a tendency to cause him to hesitate to get rid of the latter by murder.

After a most painstaking examination of the record before us, and consideration of the questions involved herein, we have, regrettable as the terrible tragedy was, and hesitant as we are to interfere with the verdict of the jury, come to the conclusion under the rules of law heretofore mentioned and the facts, that the defendant was clearly guilty of criminal carelessness, or, at least, that there was ample evidence for the jury to so find. There is, however, such serious doubt as to the defendant's guilt of a greater crime, that the jury should have resolved that doubt in his favor; that, accordingly, the verdict of the jury should be set aside as to murder in the second degree, but sustained as to manslaughter, included in the former; that the judgment herein should be set aside, and that the trial court should cause the defendant to be brought before it, and re-sentence him for manslaughter. It is so ordered.

*Judgment Set Aside, and District Court Ordered to Re-sentence Defendant for Manslaughter.*

RINER, Ch. J., and KIMBALL, J., concur.