Ada **SEARLES**, Appellant (Defendant below),

v.

The **STATE of Wyoming**, Appellee (Plaintiff below).

No. 4906.

Supreme Court of Wyoming.

Jan. 19, 1979.

Vincent A. Ross, Cheyenne, for appellant.

John J. Rooney, Acting Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Allen C. Johnson, Asst. Atty. Gen., Lindsay D. Hooper, Senior Law Student and Legal Intern, Cheyenne, for appellee.

Before RAPER, C. J., GUTHRIE*, McCLINTOCK, THOMAS and ROSE, JJ.

ROSE, Justice.

The defendant was charged with second-degree murder and, after a jury trial, was convicted of manslaughter in connection with the shooting death of Ralph Cardwell. On appeal, the defendant questions the sufficiency of the evidence to support this conviction, and urges reversible error with respect to certain instructional matters, various rulings on the admissibility of items of evidence, and alleged misconduct on the part of the prosecutor. We will affirm the conviction.

During early 1974, Cardwell rented an apartment from the defendant Searles and her husband. The apartment was located immediately above where the defendant and her family lived. Over the ensuing several years, Cardwell became accepted as a member of the defendant's family, and was hired by the defendant and her husband as a maintenance man. According to the defendant's testimony, Cardwell forced himself upon the defendant on several occasions, apparently resulting in sexual relations between them. Mrs. Searles further testified that Cardwell threatened her and her family, and that he tortured the defendant on numerous occasions. Six days prior to the shooting, Mrs. Searles purchased a gun, ostensibly for the purpose of protecting herself against Cardwell. In September of 1976, the defendant's husband gave Cardwell notice to move by October 1, because of complaints which Mr. Searles had received from one of the other tenants. During the day of September 30, 1976, Cardwell, with the assistance of Ruth Waln, moved some of his belongings to another address. According to Mrs. Searles, Cardwell, on this day, again threatened the defendant, saying that he would get her later. That evening the defendant noticed that her television was going on and off and

that the lights in the hallway were blinking. She went upstairs and asked Melvin Brown, a tenant who lived across the hall from Cardwell, to change a bulb in the ceiling light located between the Brown and Cardwell apartments. At this juncture, the evidence becomes conflicting.

According to the defendant, as Brown was reaching up to remove the light bulb she looked across the hall and started to move backward. The defendant turned at an angle, looked around, and saw Cardwell coming out his door towards her. Cardwell allegedly said, "What in the blank are you doing?", and then grabbed her between the legs—just as the hallway became completely dark. The defendant groaned and then reached into her coat pocket, pulled out a revolver, and pulled the trigger until her hands went limp.

According to Melvin Brown, he had just started to take the light bulb out when Cardwell stuck his head outside the door— "He wasn't fully out of the apartment."— and asked the defendant in a normal tone of voice if she was changing the light bulb. Brown continued taking the light bulb out and just as the socket connection was broken he heard a shot, looked down, and saw Mrs. Searles firing shots in the direction of Cardwell's apartment. Brown observed Cardwell going back toward his apartment as he was facing away from Brown and at this time the defendant was still firing the gun. Cardwell's door was wide open. Prior to the first shot, Brown heard something like a human voice. Brown did not see Cardwell make any moves toward the defendant.

According to Ruth Waln, who was in Cardwell's apartment at the time of the events in question, she heard a knock on a door—"It could have been the neighbor's door." Cardwell opened his door and pleasantly asked the defendant if she was fixing the light, to which the defendant unpleas-

* At the time of oral argument, while this case was under advisement and at the time a decision was reached, GUTHRIE, J., was Chief Justice. He retired from the Court on December 31, 1978. By order of the Court, entered on January 1, 1979, he has been retained in active judicial service pursuant to Article 5, Section 5, Wyoming Constitution, and Section 5–1–106(f), W.S.1977.

antly answered, "Yes." Cardwell did not step outside the door of his apartment. A few seconds later, Waln heard three shots as Cardwell backed to close the door. Cardwell attempted to close the door as he was backing sideways into the apartment, and finally succeeded in closing the door. Waln was not able to see who fired the shots.

A pathologist testified at trial that Cardwell was shot three times in the back and two times in the front. Either a front-entry wound to the right chest, or a back-entry wound to the left upper chest could have caused the death, but the doctor could not establish Cardwell's position when he received the bullet wounds. A forensic scientist testified that one of the shots was fired from approximately four feet and that the remaining shots were fired from more than four feet.

## SUFFICIENCY OF THE EVIDENCE

 This court has classified voluntary manslaughter as "an intermediate crime lying someplace between the excusable, justifiable, or privileged killing of a human being, and the unlawful taking of a life with malice." *State v. Helton,* 73 Wyo. 92, 276 P.2d 434, 442 (1954). The offense recognizes that there may be circumstances surrounding a killing which cannot be justified under the law of self-defense, but which more appropriately characterize the state of mind known as a "sudden heat of passion." *State v. Helton,* supra. A homicide is manslaughter if the defendant at the time of the killing was incapable of cool reflection as a result of provocation sufficient to produce such a state of mind in a person of ordinary temper. *State v. Lantzer,* 55 Wyo. 230, 99 P.2d 73, 78–79 (1940). In order to sustain a conviction for voluntary manslaughter, the wrongful act of killing must have been intentional. *State v. Helton,* supra. An accidental killing is not voluntary manslaughter. See, *Ivey v. State,* 24 Wyo. 1, 154 P. 589, 590 (1916).

In this case, then, we must consider whether there is evidence indicating an intentional killing, committed while in a sudden heat of passion, but which killing is not legally excused, justified or privileged. There is evidence that Cardwell never crossed the threshold of his apartment, thus negating the defendant's claim that she was physically attacked and that she was acting in self-defense. Even if we assume, as other evidence tends to indicate, that Cardwell did grab the defendant between the legs, we would still be unable to disturb the jury's rejection of the defendant's claim of accident or self-defense. The jury was fully instructed on the law of self-defense, including the requirement that the jury believe that defendant's cause of apprehension of serious personal injury was reasonable even though they might also be of the opinion that the defendant really thought that she was in danger at the time. (Instruction 15)

The jury was also instructed that even if the defendant was justified in using force in self-defense, she was not entitled to use any greater force than she had reasonable grounds to believe, and actually did believe, was necessary under the circumstances. (Instruction 17) See, *Loy v. State,* 26 Wyo. 381, 185 P. 796, 799 (1919). The defendant's indiscriminate firing of the gun, even after Cardwell's back was turned, tends to justify an inference that unreasonable force was used. The determination of these questions was preeminently for the jury. *State v. Sorrentino,* 31 Wyo. 129, 224 P. 420, 423, 34 A.L.R. 1477, rehearing denied in 31 Wyo. 499, 228 P. 283, 34 A.L.R. 1487 (1924). There was, therefore, sufficient evidence to sustain the conviction.

## INSTRUCTIONAL MATTERS

 First, the defendant claims on appeal that the trial court erred in giving the jury a manslaughter instruction, even though the record fails to disclose that the defendant objected to the giving of this instruction. We may not, under such circumstances, consider the issue in the absence of plain error. *Russell v. State,* Wyo., 583 P.2d 690, 700 (1978). In any event, our holding that there was sufficient evidence to sustain the manslaughter conviction carried with it the further holding that a

manslaughter instruction was proper in this case.

■ Second, the defendant claims that the trial court erred in refusing to give, over the defendant's objection, an instruction setting forth the principles announced in *Eagan v. State,* 58 Wyo. 167, 198, 128 P.2d 215, 226 (1942), as follows:

". . . *Where an accused is the sole witness to a transaction charged* as a crime, as in the case at bar, his testimony cannot be arbitrarily rejected, and if his credibility has not been impeached, and his testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted. (Citations)" [Emphasis supplied]

In order to justify the so-called *Eagan* instruction, the defendant must be the *sole witness* to the events formulating a complete offense, and the defendant's testimony must not be inconsistent with other facts and circumstances shown. See, *Cullin v. State,* Wyo., 565 P.2d 445, 452–453 (1977). In this case, the defendant was not the sole witness to the events immediately surrounding the shooting of Cardwell. Witnesses Brown and Waln testified with respect to certain parts of the entire occurrence and, to an extent, presented evidence at variance with portions of the defendant's version of the shooting. We hold there was, therefore, no error in refusing the *Eagan* instruction.

## ADMISSIBILITY OF EVIDENCE

■ The defendant claims error with respect to matters related to the admission or nonadmission of evidence. The defendant, however, made no attempt in her brief or at oral argument to present cogent argument or authority for her position. We will not, therefore, consider these issues. *Otte v. State,* Wyo., 563 P.2d 1361, 1363 (1977); *Alcala v. State,* Wyo., 487 P.2d 448, 456 (1971), cert. den. 405 U.S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466, reh. den. 406 U.S. 911, 92 S.Ct. 1613, 31 L.Ed.2d 823; *Valerio v. State,* Wyo., 429 P.2d 317, 319 (1967); and *Drummer v. State,* Wyo., 366 P.2d 20, 26 (1961).

## PROSECUTION MISCONDUCT

■ Finally, the defendant argues that error was committed because the prosecutor asked impeachment questions for which he had no impeaching evidence available. During the course of cross-examining the defendant, the prosecution asked about four specific occasions during the latter part of September, 1976, when the defendant and Cardwell allegedly had arguments. The defense raised no objection to this line of questioning, but the trial judge summoned the attorneys to the Bench and inquired whether or not the prosecutor had evidence which would sustain a belief that this activity was going on. The prosecutor responded that he had notes that Cardwell had written, at which time the defense attorney claimed that such notes were not admissible. The trial judge said that he was not concerned about admissibility and was only questioning the good faith of the prosecutor. As a final comment to the trial judge, the defense attorney stated:

"Unless they have some live witness to impeach what was said here, some good probative evidence, *I'm going to move* for a mistrial over this. Because he was asking her questions for impeachment purposes. Now unless they have some good probative evidence which is admissible, *I'm going to move* for a mistrial because the inference is this was done—or by some notes—note left by somebody after death, they are not proper." [Emphasis supplied]

The court responded: "Well, we'll find out." Thereafter, the defendant did not raise the matter again, until argument in favor of her motion for a new trial. In disposing of this question, the trial court observed that no motion for mistrial, nor renewal of a motion for mistrial was made, and that the evidence went to the issue of malice which was resolved in the defendant's favor.

In the absence of a clear and proper objection to a line of questioning, and in the absence of a request for the jury to be

instructed to disregard the objectionable questions and answers, or a request for a mistrial, we can only assume defendant was at the time content to take her chances on a favorable jury decision. *Wright v. State,* Wyo., 466 P.2d 1014, 1017 (1970). The defendant threatened to, but did not in fact, move for a mistrial.

The defendant claims, nevertheless, that the effect of such questioning was highly prejudicial. We recently addressed the potential problem of asking questions which imply the existence of a factual predicate. *Roby v. State,* Wyo., 587 P.2d 641, 1978. In *Roby,* this court found certain questions implying the defendant's involvement in an attempt to fabricate alibi evidence had a highly prejudicial effect on the defendant's alibi defense and, in the absence of a factual predicate, justified a new trial. Likewise, the cases cited by the defendant indicate improper cross-examination touching highly prejudicial matters. See, *United States v. Meeker,* 7 Cir., 558 F.2d 387 (1977); *Houston v. State,* 112 Tex.Crim. 261, 16 S.W.2d 119 (1929); and *Pressley v. State,* 71 Okl.Crim. 436, 112 P.2d 809 (1941).

In this case, the prosecutor's cross-examination was aimed at suggesting that the defendant had become angry with and cursed at Cardwell several times shortly before the shooting incident. The trial court properly perceived that these implications, at most, tended to support the State's claim that the killing was done with malice. See, e. g., *Doe v. State,* Wyo., 569 P.2d 1276, 1280 (1977). Since the jury found no malice, we hold that the cross-examination did not prejudice the defendant. This is not to say that we condone the approach used by the prosecutor; it is only to say that it provides no basis for a new trial in this case.

Affirmed.