STATE OF WYOMING

*Plaintiff and Respondent*

vs.

ANN HELTON

*Defendant and Appellant.*

(No. 2623; November 16th, 1954; 276 Pac. (2d) 434)

See also, 261 P.2d 46.

For the defendant and appellant the cause was submitted upon the brief and also oral argument of W. J. Wehrli and Marvin L. Bishop, both of Casper, Wyoming.

For the plaintiff and respondent the cause was submitted upon the brief of Howard B. Black, Attorney General, Paul T. Liamos, Deputy Attorney General, James L. Hettinger and Robert A. McKay, Assistant Attorneys General, all of Cheyenne, Wyoming and Raymond B. Whitaker, County and Prosecuting Attorney of Casper, Natrona County, Wyoming. Oral argument by Raymond B. Whitaker.

## OPINION

HARNSBERGER, Justice

Sometime near the hour of six o'clock A.M. on the morning of October 15, 1952, the defendant shot and killed her husband in the kitchen of their home, firing five shots from a .38 calibre Smith & Wesson revolver. Three of these shots struck the deceased—one bullet barely grazing his neck under the chin, one bullet passing through the body, and one bullet passing through the head. Being charged with murder in the first degree, she was convicted by a jury of murder in the second degree. Judgment was entered accordingly and the defendant was sentenced to the penitentiary for a minimum term of twenty years and a maximum term of twenty-five years. It is from such judgment and sentence that the defendant has appealed to this court.

Other than the defendant, there were living no eye witnesses to the shooting but, to establish its charge, the state introduced in evidence several photographs of the scene where the shooting occurred, the transcript of testimony given by the defendant before her arrest at the coroner's inquest, called and examined thirty-two witnesses, and offered a large number of exhibits—thirty-eight of which were received in evidence.

The defendant called and examined eleven witnesses and had two exhibits received.

From this mass of evidence we shall give such summary as we think will adequately reflect the state's material evidence, and which we feel is necessary for an understanding of our conclusions.

From the state's evidence it appears that about 7.10 o'clock on the morning of October 15, 1952, the office of the sheriff of Natrona county, Wyoming, received a telephone call indicating an emergency at the home of the defendant. The city police of Casper were noti-

fied immediately and two patrolmen responded. At the house they found two brothers of the defendant, the wives of these brothers, a physician, and the defendant. Lying on his back on the kitchen floor with the head to the south and the feet to the north was the dead body of a man, clothed only in short-sleeved, long legged underwear, Levi trousers, high-topped shoes and stockings. A .38 calibre Smith & Wesson revolver was beside the body. One patrolman testified he observed powder burns on the underwear over the abdomen of the deceased.

The kitchen was a room about eighteen feet in length from north to south and twelve feet in width from east to west. A door opened at its south end from the living room. In the northeast corner, another door, the upper half of which was glass, opened outward onto a landing with steps going downstairs to the basement and to an outside back door. Entering the kitchen from the living room, on the left or along the west side of the room, there was a counter three feet high and eleven feet long, with cupboards below. At the end of this counter, there was a partial partition beyond which was a breakfast nook of about seven feet. This nook contained a small breakfast table and chairs, as well as another small table some twenty inches wide and was placed against the north wall of the room. Almost in the center of the north wall was an electric refrigerator. On the right or east side as you entered from the living room, there was a gas range, a kitchen sink element with cupboard and drawers below. This element extended from the range to a point a little more than halfway the length of the room. Immediately north of this sink element was a broom closet about three feet long and a foot and one-half deep, and there was a window beyond this in the east wall in the extreme northeast corner. About a foot north from this

broom closet was a floor register some 1'4"x1'2" in size. Photographic evidence showed the body of the deceased lying with the head slightly north and west of the room's center, with the feet extending northeasterly toward the refrigerator. The counter on the west side was one foot ten inches deep. The breakfast table stood out from the west wall about three feet ten inches. The sink element on the east side extended out from the wall about two feet two inches. Except where the breakfast table was placed, this left a clear space in the central portion of the room of about seven and three-quarters feet, and a space between the breakfast table and the broom closet of about six and one-half feet.

Testimony as well as photographic evidence showed a large pool of blood on the floor extending from the right side of the head of the deceased toward the east, and a small pool of blood on the floor at the left of the head. There were also blood spatters on the floor extending from the body to the northeast corner of the room, with the greatest amount near the floor register. There was a wastebasket north of the broom closet, sitting partly over the floor register, and just above it there was a towel rack attached to the closet. Lying over a portion of the top of this basket was a khaki shirt, which the testimony showed may have been hung from the towel rack at the time of the shooting. There were blood drops and spotches of blood on material inside the wastebasket, both beneath the shirt and to the side of the shirt, as well as on top of the shirt. There were also blood spots on the cloth covering wrapped around a rifle which was standing in the corner made by the east wall and the broom closet. There is some testimony that a single drop of blood was found on the second step of the stairs leading down to the basement, although other witnesses did not see it. It

is also unclear whether or not the door at the north end was found open or closed when the officers arrived. There was a note on the breakfast table written and signed by the defendant, saying—

"Dear Dale

I cannot stand to live any longer. You can have every thing I own

Goodby

Ann "

Five exploded shells and one unexploded shell were found in the revolver. One bullet was found and was left imbedded in the ceiling of the stairway hall where it had lodged after passing in an obviously upward and somewhat northwesterly direction through the glass panel of the upper portion of the door leading to the basement. A second bullet was found lying loose on the kitchen floor near the floor register in the northeast corner of the room. A third bullet was found lying loose upon the kitchen floor beneath the breakfast table and near the corner of the breakfast nook made by the junction of the partial partition at the north end of the counter with the west wall of the kitchen. At a height of three feet nine and three-quarters inches from the floor was a mark, referred to in the testimony as a "ricochet mark", of a bullet on the breakfast nook side of the wall of the partial partition, and at a height of three feet eight inches from the floor was another similar ricochet mark on the west wall of the breakfast nook. The testimony seems to assume that these ricochet marks were both made by the bullet found under the edge of the kitchen table. A fourth bullet was inside the extreme south end of the counter cabinet on the west wall near the floor, where it remained after having struck the kitchen floor at a point about three feet north of the living room doorway and approximately two feet east of the counter on the west

side of the room, and then ricocheted into and through the front of the cabinet where it was found. The fifth bullet had passed through the counter cabinet at a point near the floor and approximately midway the length of the room, after it had also ricocheted from the floor at a point slightly beyond and to the left of where the head of the deceased lay, and was found inside the cabinet. A very small chip of lead from a bullet was also found on the floor near the head of the deceased, as was a portion of one of his teeth.

Expert medical testimony of the pathologist who performed an autopsy of the body of the deceased, indicated the wound on the neck under the chin was superficial and barely grazed the left side of the neck, passing from left to right, and was inflicted fifteen to twenty seconds before death or after death.

The wound through the body was described as passing through the center of the victim's body and at a point some sixteen centimeters above the umbilicus. The pathologist said this wound was caused by a missile entering the *back and emerging from the front* of the abdomen, after having penetrated the base of the left tenth rib, the medial edge of the left lower lobe of the lung, the aorta, the right ventricle of the heart, and soft tissues. The wound was of such character as would have caused death within a minimum of ten seconds to a maximum of less than one minute, probably around forty-five seconds—and there was no external bleeding from the wound. At the preliminary examination this expert had testified he had found a grayish discoloration of about three inches in area around the wound *on the deceased's abdomen,* and that this discoloration was typical of powder burn, and that it was a powder burn.

The wound through the head was described as enter-

ing the left cheek near the left corner of the mouth, passing rightward and backward, breaking off the second molar tooth, entering the roof of the mouth on the right side, passing through the bone of the palate, and rupturing a major branch or possibly several branches of the right carotid artery. This would bleed somewhat profusely—both internally and externally —and although it was a fatal wound, the deceased would have lived longer after its infliction than after the infliction of the body wound, because the carotid artery is a smaller vessel and the degree of hemorrhage would be less in a given period of time and, therefore, life would have continued possibly a couple of minutes as a maximum, or as the witness otherwise testified, "I would expect that to be fatal within a period of three minutes at the most, two to three minutes.' " This pathologist also said it would not be possible from an autopsy examination to determine whether the body wound — or the wound through the head — was first inflicted.

Another doctor who was present at the autopsy and who had also viewed the body in the kitchen before it was moved, testified that he had observed no powder smudging or tatooing around any of the wounds, and that the missile which caused the body wound had entered the back. This doctor testified *that the body wound was inflicted before the head wound,* giving as his only reason for such conclusion, that the carotid artery had been shot off.

An expert in examining bullets, cartridge cases, and related firearms, as well as in making powder pattern tests to determine distances from which a weapon was fired, testified some of the bullets here mentioned were fired from the revolver found near the body. He further testified, that after microscopic examination of the underwear worn by the deceased and through which

the missile inflicting the body wound had passed, he had found no evidence of any powder smudging, powder burns or powder particles. The expert also testified that tests conducted by him with the revolver in question, and ammunition of the same kind as that found in the one unexploded cartridge, showed that when the weapon was fired, the maximum distance from the muzzle where powder smudging would occur would be eighteen inches, and the maximum distance where powder particles would be found was four feet.

A handwriting expert said the note—written by the defendant and found on the breakfast table—was not written under emotional strain or stress and "was not written under any force, under any strain whatsoever."

A female guard stationed with the defendant at the hospital to which she was taken on the day of the shooting, and after her arrest, testified that the defendant complained about her left arm—protected it with her right hand—and had trouble with the arm.

A friend of defendant's testified the defendant had once said it would be nice to have a little stake to go into a motel she liked.

Close neighbors of the defendant, a man and wife, said they heard three shots approximately ten minutes after six o'clock the morning of the shooting.

The above completes a gist of the evidence offered by the state, with the exception of the transcript of the testimony given at the coroner's inquest and before her arrest. This transcript was evidently placed in evidence by the state to establish necessary elements of the crime charged.

The testimony recounted that over a period of five years following the marriage of the parties, the deceased, without just cause or provocation, had subjected the defendant to some eight different assaults of varying degrees of severity; that the parties lived in a home owned and maintained by the defendant, and the defendant managed two small cottages across the street which were owned by the deceased, the defendant doing the physical work of cleaning, decorating and caring for these properties, as well as attending to their management and renting; that the deceased never paid any of the defendant's expenses, but on her part she had bought for the deceased the revolver used in the shooting, a rifle and a shotgun, and had also purchased a Jeep to haul a trailer house, and she had also contributed about one-half the cost of the trailer house; that on the evening before the shooting, the parties had a quarrel, and that early the following morning the deceased came to the defendant's bed, renewed the quarrel, and said to her "I don't trust you any more, you know too much about me and I'm going to kill you.' "; made her get up and dress, told her he was going to kill her by first knocking her out and then cutting her wrists; took her upstairs to the kitchen, forced her—by twisting her left arm behind her back until she nearly fainted—to write the note which was found on the breakfast table, and then, when she stood up, he hit her in the stomach and knocked her down; that she became unconscious and on regaining consciousness she asked her husband for a towel as she was gagging; that he told her she would soon not need a towel and she knew she did not have very long; that she edged over on the floor toward a drawer in the lower northeast corner of the sink element where she kept towels and remembered that they sometimes kept the .38 calibre Smith & Wesson revolver in that drawer, and thought if she could get it she could

"scare him, and make him sit quiet while I could get to the phone or out the back door"; that she took the revolver from the drawer and raised up, intending to escape through the rear door in the northeast corner of the kitchen, when her husband—who was then sitting at the end of the breakfast table—saw what was happening; that she said "Don't move. I have you covered.' "; that "he was like a cat, so agile, so strong, and he just took that chair and he slid back and jumped back and whirled and was on me before I knew it. I can't tell you much more of what happened. I shot and the gun was loaded. I don't know how many times I shot. I simply know that I was blacking out, going out, could feel myself slipping; and felt him let loose of me, and I guess I still shot. I don't know. I guess I just jumped to the other side of the room"; that when he sprang at her she "knew there was no chance in the world."

Again, the transcript shows she stated, "he had backed me into — he kept coming toward me, and backed me that way — there is a window there, and he came right back to me there, and backed me towards that window"; and, again she had testified, "the next thing I knew he had pinioned me by the window part of the door, by the other door there in the corner, but I had shot just as he was coming right on top of me. I don't know what shot felled him. I just kept shooting I guess"; and, "He had me crowded against the corner struggling — not much of a struggle, but he was coming toward me. I don't know how many times I shot; and he *turned around*—I didn't know what he was doing, *just kind of whirled a little bit.*" (emphasis supplied)

Also, at that inquest, she was asked "Mrs. Helton, you don't recall any shots except the first one?" She answered "Not any. I just know I shot. I didn't know

if the gun was loaded or anything. All I wanted to do was frighten him and keep him still until I could get out of there or get to the phone, and when he whirled or started at me, I pulled the trigger, and when he pounced on top of me, I just kept firing. *When he whirled,* I didn't even think he was shot." (emphasis supplied)

We have purposely refrained from summarizing any portion of the testimony given by the defendant in her own behalf at the trial, although we find no such conflict in the evidence as would limit our consideration merely to the evidence of the successful party. However, it may be well to comment that contrary to the state's contention, an examination of defendant's testimony at the trial shows it to be in substantial accord with that which she had previously given at the coroner's inquest, and the transcript of which was used by the state as a part of its proof at the trial.

As indicated in the opening statement of the prosecutor, the state's theory in bringing a charge of first degree murder was that the defendant purposely and with premeditated malice shot the deceased in the back; that she killed him in order to get his property; that after shooting the deceased in the back, she inflicted the wound through the head and the wound under the chin, firing altogether only three shots, and that she then proceeded to alter the scene in the kitchen, even to the extent of moving the body of the deceased into an unnatural position and presumably firing two additional shots.

The jury's verdict removes all question of premeditation.

We believe the jury was entitled to accept the state's theory that the body wound was made by the bullet having entered the back of the deceased despite

the testimony of one doctor and one officer that they had observed powder burns around the wound on the abdomen of the deceased, as the contrary testimony of the ballistic expert, who had made a microscopic examination of the underwear through which the bullet passed, would seem to be the more reliable.

We agree, however, with defense counsel, that the absence from the record of a photograph showing the wound in the front of the body, while a photograph was received in evidence showing the wound in the back of the body, does seem somewhat strange, particularly when the state's case had been so carefully and ably developed in every other particular. Nevertheless, the testimony of the expert that there were no powder burns, was substantial evidence, and the jury was privileged to believe it. In any event, even though the bullet may have entered the back of the deceased, the fact does not necessarily establish the state's theory that the killing was malicious, for as is later shown, the infliction of that wound in the back was not at variance with the defendant's version of the shooting.

The absence of evidence to support the covetous motive attributed to the defendant, or to substantiate the claim that the scene had been altered, plus the photographic exhibits placed in evidence by the state itself, all so strongly corroborate the defendant's statement as to her recollection as to what happened, and to refute the claim that the body had been moved or the scene otherwise altered, that the state's theory of a malicious killing is weakened, rather than strengthened.

It is certainly consistent with the defendant's story that the head wound was the first, and was inflicted as the deceased sprang toward the defendant. The blood spots in the northeast corner of the room by the cold

air register, over and within the wastebasket, on and under the shirt, and upon the cloth around the rifle, were necessarily from the external bleeding of that wound, and could have been made as the deceased was struggling with and was pinioning the defendant back against the wall and window, because the body wound did not bleed externally. These physical facts fit in with her story, that as he whirled away from her — with the defendant still shooting — he was struck in the back, fell to the floor where the head wound continued to bleed until death came.

It is consistent with the defendant's story to find a bullet hole through the glass panel of the rear door, ranging upward in a northwesterly direction and lodging in the ceiling of the stairwell to the basement, as such a shot could have been fired while the defendant was pinioned with her back against the east window with her arm upraised in the struggle.

It is consistent with the defendant's story to find the ricochet marks on the floor with bullets lodged in the cupboards under the counter, where they might have been fired from approximately the northeast corner of the room where the struggle took place, and toward the south in a somewhat westerly direction, after the deceased had turned or "whirled away" from her.

It is consistent with the defendant's story to find ricochet marks on the walls of the breakfast nook with a spent bullet under the table ,indicating that shot was fired from the northeast corner of the room toward the west, which could have been the first shot fired.

These consistencies are not disturbed by evidence that some blood was found on the top of the kahki shirt and some in the wastebasket beneath the shirt. Defen-

dant said they struggled in that corner, during which time the shirt which hung above the wastebasket may easily have been dislodged after some blood had fallen into the wastebasket and more blood fell after the shirt had fallen atop it. The fact that a neighbor and his wife heard only three shots, when measured against the consistencies of the defendant's story with so many physical facts and, particularly, with five bullets being accounted for, becomes of little moment.

Additionally, credence is inspired for the defendant's account of what happened, when it is remembered that her story as initially related by her shortly after the affair, was found to be corroborated by so many physical findings.

The blood spot on the second step of the basement stairs is not shown to have any relevancy whatever. The testimony of the handwriting expert — who concluded that the note was not written under any emotional strain or stress—taxes credulity. Even under the state's theory, such a conclusion must assume the improbable—that there was no emotional strain or stress present in a person who had deliberately shot and killed another, but that on the contrary the note was written with complete emotional control.

The force of the one doctor's testimony to the effect that the shot through the body was the first received — rather than the shot through the face — is weakened, when it is noted that he gave as the reason for this conclusion, that "the carotid (artery) was *shot off*" (emphasis supplied), while the testimony of the pathologist who performed the autopsy, and was in a superior position to know, was that the shot through the head only *"ruptured* in the passage a major *branch* or possibly several branches of the right carotid artery." (emphasis supplied)

Furthermore, the testimony of the state's pathologist, that life might have continued for two or three minutes after receiving the face wound because the carotid artery was smaller than the aorta, but that life could only last from ten seconds to a maximum of *one* minute after the infliction of the body wound—which did not bleed externally — when considered together with the physical evidences portrayed by the blood spots and splatters in the northeast corner of the room, the large pools of blood near the victim's head on the floor, the ricochet marks on the walls and floor, the lodgment of two bullets in the cabinets with two other bullets found lying loose upon the floor, all fortify doubts as to the dependability of testimony that the body wound was the first of the two fatal shots.

If the body wound did not bleed externally, then it was the face wound which accounted for the blood splatters in the northeast corner and which later made the large pools of blood on the floor near the head of the deceased. If the body wound was first, then all external bleeding occurred within ten seconds to *one* minute after its infliction, but if the head wound was first, there could have been *three* minutes of such bleeding. Neither should it be overlooked that another of the state's medical witnesses, the pathologist, testified that it could not be determined from an autopsy which of these two wounds had been first inflicted.

But, by the defendant's own story, the deceased was not molesting her at the particular moment when she menaced him with the deadly weapon, as is hereinabove set out in detail, although the tenor of her testimony strongly infers that she was then acting in self-defense. Who can say with more authority than the jury whether his springing toward her and grappling with her was the act of a man acting precipitously in his own defense to protect himself, rather than that of a man

initiating such an attack upon the defendant as would have justified his being killed?

As was said in State v. Sorrentino, 31 Wyo. 129, 138, 139, 225 P 420, 423:

" * * * If a cautious and prudent man under the same circumstances, would not believe the danger to have been real, then the defendant cannot be said to have been justified in his action. We think that the determination of that question in the case at bar was preeminently for the jury under proper instructions of the court.*      *                                 *       "

So also here, the answer to this question was for the jury to find, and we should not substitute our conclusion in the matter for that of the jury's even if our own reaction to this evidence was different.

The next question is, does the evidence warrant a finding that the killing was done maliciously?

It is not too difficult to find the answer, in view of what this court has previously said in Eagan v. State, 58 Wyo. 167, 128 Pac (2d) 215, where a somewhat full discussion on the subject of malice in homicide was given, and we do not feel it necessary to again refer to the authorities cited in that case, but feel it enough to say we believe they are equally applicable and in point here.

While we find in the record no evidence of expressed malice, the law sometimes implies a legal malice in homicides, even in cases where no motive is proved. On the other hand, this court has said that " * * * If the facts and circumstances of the homicide appear, malice is inferred, not from the use of a deadly weapon alone, but from all of the facts and circumstances so shown. * * * " Eagan v. State, 58 Wyo. 167, 196, 128 P. (2d) 215, 225.

What are the "facts and circumstances" here, from which to infer legal malice?

We are well aware that it may have been beyond the power of the prosecution to show to the jury with certainty the detail of just what happened. The only living person who knows, is the defendant, and she confesses to a somewhat confused recollection of much that must have occurred. Nevertheless, it was incumbent upon the state to prove circumstances from which legal malice might be justly inferred. Did it do so?

We are satisfied that the prosecution failed to successfully impeach the credibility of the defendant. It failed to prove its asserted motive. It failed to substantiate its claim that the scene of the shooting was altered. It did, however, elect to rely upon the testimony of the defendant to prove necessary elements of its charge and, under the law of this state, as announced in Eagan v. State, 58 Wyo. 167, 198, 128 (P. (2d) 215, 226, the defendant being the sole witness to the transaction charged as a crime, her testimony must be accepted as true, as it " * * * is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith * * * ".

While many definitions may be found of "Legal Malice", "Implied Malice" and "Constructive Malice", which say in substance that such malice denotes merely the absence of legal excuse, legal privilege or legal justification, these definitions fail to satisfy when they are placed under the scrutiny of close analysis or of subjective reasoning. In homicide, if the killing be legally excusable, legally privileged or legally justifiable, there can, of course, be no legal conviction of any crime. Conversely, if legal conviction is had, there must be an absence of legal excuse, privilege or justification. Hence, if such definitions are accurate, then in

every legal conviction of homicide there would be legal malice, implied malice or constructive malice. This of course, is not so.

Our laws recognize an intermediate crime lying someplace between the excusable, justifiable or privileged killing of a human being, and the unlawful taking of a life with malice. This is an unlawful type of voluntary homicide which is not legally excused, privileged or justified, but wherein there is an absence of express legal, implied or constructive malice. So we find in our law, that the intentional (i.e. voluntary) doing of the wrongful act, "upon a sudden heat of passion", although completely free of express, implied, constructive or legal malice, but committed without legal excuse, privilege or justification, is a punishable crime which we call voluntary manslaughter. This simply recognizes that there may be circumstances surrounding a killing which cannot be justified under the law of self-defense, and while not producing that degree of mental disturbance or abberation of the mind which is necessary in law to excuse the homicide, still leaves the mind devoid of that wicked, evil and unlawful purpose, or of that wilful disregard of the rights of others which is implied in the term "malice". Such circumstances mitigate or extenuate the act and make the homicide a crime of lesser degree. The "sudden heat of passion" contemplated by our voluntary manslaughter statute is descriptive of just such a state of mind, and it may occur from any emotional excitement of such intensity that it temporarily obscures reason, or leaves the mind bereft of reason.

In State v. Sorrentino, 31 Wyo. 129, 139, 224 Pac. 420, 423, the court said:

" * * * In its popular sense, the term malice conveys the meaning of hatred, ill will, or hostility toward another 29 C.J. 1084. That is not its legal meaning,

but the term nevertheless implies a wicked condition of mind while the homicide is committed; a mind, we may say, committing the very act willfully. See definitions 2 9 C.J. 1086. If the homicide is committed under circumstances sufficiently mitigating or extenuating, the crime is reduced to manslaughter. * * * "

After so expressing itself and notwithstanding its refusal to disturb the jury's rejection of the defendant's plea of self-defense, the court proceeded to explain that the circumstances in that case were of such character that they induced a degree of fear and terror which rendered the defendant incapable of cool reflection — to unnerve him and create in his mind confusion and fright. Because of this, the court concluded that the jury had no right to find the defendant guilty of more than manslaughter and so reduced the conviction from murder in the second degree to manslaughter.

In Eagan v. State, 58 Wyo. 167, 198, 128 P. (2d) 215, 226, this court said:

" * * Where an accused is the sole witness of a transaction charged as a crime, as in the case at bar, his testimony cannot be arbitrarily rejected, and if his credibility has not been impeached, and his testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted. * * * "

Also, the court said in the same case, 58 Wyo. 167, 196, 128 P. (2d) 215, 225:
" * * * It would seem to follow that if the evidence is as consistent with guilt of a lesser crime as it is with the guilt of a higher, the conviction should be of the lesser. * * * "

Putting these two statements together, and applying them to the facts of this case, we may fairly say, that the defendant, being the sole living witness to the

shooting, her testimony, including that portion describing her condition and the antecedent reasons for it, all tending to show that she was in a highly upset, frightened, and confused emotional and impassioned condition, should not have been rejected by the jury. Her credibility had not been successfully impeached, her story was not shown to be improbable nor inconsistent with the facts and circumstances shown, but it was in fact shown to be reasonably consistent with such facts and circumstances and, therefore, the jury had no right to convict her of a greater crime than that of voluntary manslaughter.

It might also be added, that in this case, as in the Eagan case (58 Wyo. 167, 205, 128 P. (2d) 215, 228) " * * * If the defendant is guilty of murder, we ought to be able to find a motive * * * ", although motive is not essential. The absence of motive should have considerable influence in determining the degree of guilt. The complete failure of the prosecution to offer even a scintilla of evidence to bear out its claim that the defendant killed for money, deflates even the state's theory of malice.

In addition to matters already discussed, the appellant claims error because the prosecuting attorney made opening statements which were not supported by the evidence; that the state failed to have some witnesses testify after having been subpoenaed; that certain of the state's expert witnesses failed to produce in court materials used by them in making tests about which their testimony was given; that the state's expert witnesses, being government officials, were not available for employment by the defendant; that the state failed to notify the deceased's physician or the physician first at the scene of the tragedy that the state was performing an autopsy on the body of the deceased, and that there were some persons who had

visited the scene of the tragedy who were not called as witnesses for the state. We do not feel any of these complaints have sufficient merit to require discussion.

The appellant also alleges error because of the court's refusal to give instruction "A" which was offered by the defendant. This was an instruction on the law of self-defense, and the matter contained therein was sufficiently covered by instruction No. 10 which was given. However, instruction "A" should not have been given in any event because of the last paragraph, which reads as follows:

" In order to justify and excuse the killing of a human being or the inflicting of great bodily harm upon a person, it must appear at such time that the accused was acting under a reasonable belief that she was in imminent danger of death or of suffering great bodily harm from her adversary and that it was necessary for her to kill or inflict great bodily harm upon her adversary in order to prevent the death of or great bodily harm to herself. *In such cases the killing or the inflicting of great bodily harm is purposely done, and it may be done with malice or without malice, and if done with malice under such circumstances, the accused cannot be convicted, if the right of self-defense actually existed.* "

We cannot agree that an act done in self-defense can be said to be a malicious act.

The refusal of defendant's exhibit "B", which would have instructed the jury that the positive testimony of one creditable witness to a fact is entitled to more weight than the testimony of several witnesses who testify negatively, is also assigned as error. It is contended that the testimony of neighbors that they heard only three shots, while there was other evidence that five shots were fired; that certain witnesses testified they heard no noise or threats at the Helton house; and that the testimony of the deceased's fellow em-

ployees that deceased had exhibited no acts of violence or made no threats in their presence, was all negative testimony and, therefore, justified the instruction.

We think that this evidence is not of sufficient importance to justify a reversal of this case, even if such instruction were a proper instruction under the circumstances, which point we do not now decide.

The defendant complains of the giving of instruction No. 4 which told the jury that it was their duty to successively consider whether the defendant was guilty of murder in the first degree, murder in the second degree or manslaughter, contending that inasmuch as the state had failed to prove motive, there was no evidence upon which the jury could have found the defendant guilty of either murder in the first degree or second degree. Counsel seems to concede there is some doubt as to the correctness of their complaint with respect to murder in the second degree. It is unnecessary for us to give any consideration to the matter of murder in the first degree, and, in any event, our disposition of this matter makes the point unimportant here.

Instruction No. 13 was given, instructing the jury that the information or charge filed against the defendant was no evidence of the defendant's guilt or innocense. This instruction, it is said creates the irresistible inference that it was incumbent upon the defendant to make some proof to establish her innocence. No authorities are offered to fortify the defendant in this criticism nor any argument which we find persuasive.

The following instruction No. 20 was given:

" The Court instructs the jury that in weighing evidence, each piece and all the evidence should be weighed and considered together with all the other evidence

in the case; and you should arrive at your verdict from due consideration of the whole of the evidence. If the jury, after considering all the evidence, have a reasonable doubt of defendant's guilt, arising out of any part of the evidence, you should find her not guilty. But this does not mean that you must find every single item of testimony to be true before you can convict. If after weighing and considering all of the evidence, you have a reasonable doubt that any material fact, as set forth in Instruction numbered 5, has been proved, then you are bound to acquit. The reasonable doubt that the jury is permitted to entertain must be as to the guilt of the defendant on the whole evidence, and not as to any particular fact or circumstance in the case other than those facts set forth in Instruction numbered 5."

The appellant says that by this instruction the jury was told that it need not find every single item of testimony to be true before it could convict, that the inference is left that as to defendant's defense of self-defense the jury must find every single item true, and that the instruction should have contained a correlative statement that as to the defense of self-defense it was not necessary for the jury to find every single item of testimony in relation thereto to be true before it could acquit the accused. We cannot agree with the appellants' reasoning for, in fact, the instruction seems to be, if anything, more favorable to the defense than to the prosecution.

In view of what we have said with respect to the testimony relative to the presence or absence of powder burns on the abdomen of the deceased, the rejection of exhibits "C-1" and "C-2" which were photographs of the results of test shots fired with the revolver used by the defendant and exhibit "D", which was a photograph of comparative tests made with black and smokeless powder, would not constitute reversible error in this case in view of the ultimate disposition which is being made.

From what has been said, it should be plain that we find no evidence in the record of facts and circumstances which entitled the jury to conclude the defendant acted maliciously in the killing of her husband, yet, we do feel that even from the defendant's own version of the affair, the jury was justified in rejecting her plea of self-defense. We must therefore follow the pattern set in the Sorrentino case, supra, and the Eagen case, supra, and hold that the verdict of murder in the second degree must be set aside but a verdict of manslaughter be sustained. The judgment and sentence of the lower court is, therefore, hereby set aside and the trial court directed to have the defendant brought before it for re-sentencing and thereupon that the court enter its judgment of conviction of the crime of manslaughter and sentence the defendant accordingly.

Judgment set aside and District Court ordered to re-sentence the defendant for manslaughter.

BLUME, C. J. AND RINER, J. concur.