Loretta Brewer DOE, formerly Loretta Brewer, Appellant (Defendant below),

v.

The STATE of Wyoming, Appellee (Plaintiff below).

No. 4705.

Supreme Court of Wyoming.

Oct. 11, 1977.

Wyatt R. Skaggs, Casper, for appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div.,

and Peter J. Mulvaney, Sr., Asst. Atty. Gen., Cheyenne, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

Appellant was charged in the District Court of Sweetwater County with the first-degree murder of her former husband, Leo Mosier. After a jury trial, she was found guilty of second-degree murder, and sentenced to a term of not less than twenty nor more than twenty-one years in the State Reformatory for Women, York Nebraska [there being no accommodations in Wyoming for female convicts at that time]. Appellant did not deny the homicide and on appeal raised the single issue of whether there was sufficient evidence of intent and malice to sustain the conviction. We hold that there was sufficient evidence from which a jury could reasonably infer malice, and will sustain the jury's verdict.

Appellant and the deceased were divorced in March, 1974, but subsequently lived together at Space 25 of the Bechtel White Mountain Trailer Court in Rock Springs, Wyoming. At approximately 8 a. m., on March 21, 1975, police responded to a call concerning an occurrence at this residence. Upon arrival, they observed the body of Leo Mosier lying face-up outside and near the front steps of the mobile home. A broken fishing pole was lying beneath his legs. A hair, similar to that of the deceased's, was extracted from a crack in the pole. A single-action, six-shot, 22-caliber, Frontier Scout Colt pistol belonging to the appellant was recovered from the Smith mobile home, located nearby, and when recovered the pistol was cocked and contained two spent and four live cartridges. Further investigation inside the residence revealed that a bullet had been fired through a living room partition, into the kitchen, and out of the kitchen window. A second bullet was recovered from the deceased's head. This bullet had entered his head at a point two inches behind the left ear opening, traveled upward through the brain and lodged in the front right portion of the head. Inside the trailer, a gun holster was discovered beneath a bed in the master bedroom, and a large purse was discovered near a coffee table in the living room.

At trial, a neighbor and appellant's present husband, Jim Doe, testified to a series of altercations which began the evening of March 19, 1975. Mr. Doe related that appellant and her two daughters had sought refuge from the deceased in Mr. Doe's trailer; that the deceased had entered the Doe trailer and beat appellant and Mr. Doe; and that the police were called and viewed the resulting property damage. Mr. Doe testified that there were several altercations with the deceased during the evening hours of March 19 and the early morning hours of March 20, and that deceased had threatened to kill all of them. On March 20, Mr. Doe and appellant went to the Sweetwater County Attorney's office to file a complaint against the deceased, but no action was taken that day by the deputy county attorney.

Another neighbor, Virgie Ann Smith, testified that at 7:30 a. m., March 20, one of appellant's daughters came to her trailer and asked her to call the police because deceased was beating appellant. Mrs. Smith called the police twice, but did not observe a police response. Later the same day, Mrs. Smith observed deceased and a man named Kinnison carry liquor and a handgun out of deceased's residence. Appellant testified that the trailer had been broken into sometime during March 20 and that deceased's belongings had been removed. Appellant contacted the sheriff's office later that day to ask why deceased had not been arrested. At about 6 p. m. that day, Mr. Doe joined appellant and her daughters for dinner. He brought along his pistol, which was later left in the trailer. Appellant and her daughters stayed in their trailer and went to bed.

According to appellant's testimony, the following events occurred the morning of March 21: She sent her children off to school about 8 a. m., closed the broken front door, pushing a rug against it, and went back to bed. Suddenly the door opened and

appellant asked who was there. Deceased responded, "I'm back to finish what I didn't do last night, and you have nobody to protect you now." Standing in the doorway of the master bedroom where appellant was lying, deceased reached in a closet and obtained his fishing pole. He then allegedly struck appellant with the pole three or four times, grabbed and pulled her hair, and pinned her to the bed with his knees on her arms. There was no physical evidence indicating the appellant had been beaten on this occasion. She further testified she was able to get her right hand free and that she picked up the pistol which was lying on a nightstand next to the bed. The witness did not recall whether the gun was there when she went to bed the night before. She cocked the gun and told the deceased to leave, saying, "Please go. Don't cause no more trouble. Don't do this. Don't do something you will be sorry for." He replied, "Nobody will never know. We have a plan all ready for you." The deceased backed out of the bedroom and went into the living room. Deceased looked at appellant and said, "You love me too much." "You don't have guts enough." "I'm not afraid of that little gun." Deceased started toward appellant, but she fired a shot in a direction away from deceased and towards a living room wall near the front door. Appellant cocked the gun again and moved closer to the center of the living room, backing deceased closer to the open front door. Appellant again told the deceased to leave, telling him "to take his fishing pole that meant so much that he drove a hundred and forty miles for and go." Deceased said he wasn't going to leave and, "You don't have the guts to shoot." As deceased backed toward the front door, he grabbed appellant's large purse, which was sitting on a small freezer near the front door, with his right hand and flung it in appellant's direction. At the same moment, appellant fired a second shot, which fatally wounded the deceased. Appellant testified that the deceased was facing her, but had turned his head in the process of flinging the purse. She further testified that deceased then fell backwards out the door. Appellant ran to the door, called the deceased's name, and then knelt and took his hand. She then blacked out.

Mr. Kinnison was sitting in his car outside the trailer during the occurrence. He testified that, although he didn't hear any shots because of music in his car, he saw the deceased come out of the door face-forward and fall behind another car. He said the deceased had a fishing pole in his left hand. Mr. Kinnison left and went to neighbors to call the police. He had seen appellant in the doorway with a pistol in her hand.

Mrs. Smith testified that appellant came running into her trailer, hysterical, and screaming, "Oh, my God, I killed him. I didn't mean to. I killed him." Appellant was waving a gun, which Mrs. Smith took away from her. After phoning the police, Mrs. Smith proceeded to the deceased's trailer, observed the deceased lying face-up, and observed a purse and scattered contents lying on the living room floor near a coffee table.

Various witnesses testified as to violent confrontations between appellant and the deceased. As previously indicated, Jim Doe testified to altercations over the two-day period prior to the shooting. A stepdaughter, who was married and living in Utah, testified to an occurrence when the deceased had threatened to kill the family and had attacked and beaten the appellant. She also testified, however, that she and the appellant had argued the night of the first day of the trial and that appellant had threatened her and said maybe she (the stepdaughter) "would be next." A neighbor, Linda Anderson, testified that she had seen the deceased chasing his older boy with a shovel. She also testified that some time after appellant had been released from jail, she (the appellant) had said she "should have killed the other guy, too." Mrs. Smith testified that when she picked appellant up from jail, appellant told her, "I'm not sorry. I'm not one God damned bit sorry. If I had it to do, I would do it all over again. I'm not sorry I killed him."

Appellant testified that deceased had beaten her severely in Nebraska, while she

was recovering from an operation; that deceased had attempted to kill her in Colorado, requiring hospitalization for about ten days; and that deceased had tried to choke her in Saratoga. She also testified that she was afraid at the time of the shooting and had no way to escape from the trailer. Appellant admitted she had previously pulled a gun on deceased in Rawlins, to get him out of her house; that she had also tried to run over him with a car after he had choked her and urinated on her face; and that she had cut another former husband with a knife, requiring numerous stitches.

■ Our basic task in these types of cases is to determine whether there was sufficient evidence to prove intent and malice beyond a reasonable doubt. *Nunez v. State*, Wyo., 383 P.2d 726, 728. Malice may be inferred from the use of a deadly weapon in a dangerous and deadly manner if the facts and circumstances so allow. *Smith v. State*, Wyo., 564 P.2d 1194, 1198. Malice may also be inferred from all the other facts and circumstances. *Eagan v. State*, 58 Wyo. 167, 128 P.2d 215, 225. In considering the evidence before us, we must accept as true the evidence favorable to the prosecution and give the State the benefit of every favorable inference which may be reasonably and fairly drawn. *Cullin v. State*, Wyo., 565 P.2d 445, 448. We are mindful, however, of two other principles which may often be applicable when reviewing second-degree murder convictions. In *State v. Sorrentino*, 31 Wyo. 129, 224 P. 420, 423, we held that this court may reduce a homicide to manslaughter if committed under circumstances sufficiently mitigating or extenuating, such as fear or terror of such a character or degree as to render the accused incapable of cool reflection. See *Nunez v. State, supra*, at 729; and *State v. Helton*, 73 Wyo. 92, 276 P.2d 434, 443. Secondly, whenever the State attempts to rely on a defendant's testimony to prove an element of the alleged offense, another principle must be considered. *State v. Helton, supra*, at 442.

In *Eagan v. State, supra*, at 226, we held:

" . . . Where an accused is the sole witness of a transaction charged as a crime, as in the case at bar, his testimony cannot be arbitrarily rejected, and if his credibility has not been impeached, and his testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted. . . ." [Citations omitted]

This rule, however, is applicable only where the defendant's explanation remains uncontradicted, either directly or by fair inference from the testimony and evidence. *Cullin v. State, supra*. The *Eagan* rule is an important one, and a diligent search of the record is required to ascertain whether it should be applied. Where the rule is applicable, the defendant's version of a homicide must be accepted—even in the face of a jury verdict to the contrary. In these cases, our duty is neither to substitute our opinion for that of the jury, nor to blindly accept the jury's determination as correct. We are required, in order to sustain the conviction, to find that there is sufficient probative evidence, direct or circumstantial, to prove intent and malice beyond a reasonable doubt. In doing so, we cannot—and will not—retry the facts of a case, but will only apply the rules set forth herein to the particular facts and circumstances which are presented.

■ In the instant case, our reading of the record discloses that the *Eagan* rule cannot be applied to negate the jury's finding of intent and malice. A critical aspect of the State's case was its theory that the deceased was shot from the rear while walking out of the trailer. An expert for the State opined that this was the case, given the location of the entrance wound. The expert admitted on cross-examination, however, that the entrance wound could also be consistent with appellant's version of the shooting. Standing alone, we are not convinced that this evidence would give rise to fair inference of malice. There was, however, other evidence tending to discredit the appellant's story which, in combina-

tion with the entrance-wound location, would be sufficient to give rise to such inference. First, there was medical testimony that the deceased would have dropped immediately upon entry of the fatal bullet. Second, there was evidence indicating a lack of remorse. Third, there was evidence of defendant's propensity to react violently in a retaliatory fashion. From these circumstances, we cannot say as a matter of law that appellant's version of the shooting remained reasonably unimpeached. There were facts, therefore, from which the jury might fairly have drawn an inference of malice.

Affirmed.