Edward James LEITEL, Appellant (Defendant below),

v.

The STATE of Wyoming, Appellee (Plaintiff below).

No. 4868.

Supreme Court of Wyoming.

May 25, 1978.

John V. Lake, Powell, for appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., and Richard H. Honaker, Asst. Atty. Gen., Cheyenne, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

For seven years prior to the incident with which we are here concerned, the appellant, Edward James Leitel, lived with Susan Lloyd in a relationship in which Susan described herself as Mr. Leitel's "common-law wife." They began having trouble in the last three years of this association because Leitel fell to keeping company with other women, and, on January 16, 1977, they commenced living in separate residences at Powell, Wyoming.

On January 22, 1977, Susan met and began dating John Stearns, which caused Leitel and Susan to have a serious argument on January 26, 1977—one week before the appellant shot and killed Stearns. Leitel, in his confrontation with Susan on the 26th, threw and shattered a glass against a window in Susan's home and slapped her around in a fit of temper. He also took some of his guns from the house, telling Susan that he was going to sell them. The next day he attempted to find her to apologize for his misbehavior.

The testimony of record reveals that, before the January 26 incident Susan had expressed fear that if appellant were to find her and John Stearns together he would kill them. However, there is no indication that the appellant threatened Stearns prior to the shooting on February 2, 1977. In fact, the record indicates that Leitel and Stearns were casual friends and had not had any prior confrontations because of Susan or for any other reason. Leitel did testify that he was aware of the fact that Stearns was never very far from a gun.

On February 2, 1977, appellant arrived at Susan Lloyd's home at 5:30 a. m.—ostensibly to talk to her 9-year-old daughter. He offered to give Susan a ride to work and became irritated when she informed him John Stearns was going to pick her up. He still appeared upset when he called Susan that evening to tell her that he was driving to Byron, Wyoming, with another woman— one Shirlea Hand.

Appellant, with Shirlea, Wayne Leitel (appellant's brother) and Susie Williams, arrived at the Byron Bar at 9 p. m. The evidence shows that he was in a "funny little mood"; and he testified that he felt like leaving the bar and being alone. The bartender heard him say to his brother, "I got something on my mind." Wayne Leitel testified that he discussed appellant's relationship with Susan but Stearns' name was not mentioned. Appellant said to his brother:

"I want to get out of here for a while. I want to think. I want to be by myself. I don't want to party tonight."

Wayne cautioned appellant not to do anything he would be sorry for, whereupon Edward Leitel left Byron for Powell. After arriving at Powell, appellant bought some sausage, placed it in the freezer and changed his clothes before going to see Susan. He did not, at this time, know Stearns was with her. Throughout the evening, appellant had done some drinking, but there was no evidence to the effect that he was drunk—nor does he claim he was drunk.

Some time after 9 p. m. that evening, John Stearns and Susan were sitting in the living room of Susan's house when they were surprised by a fast-moving vehicle turning into the driveway. As he entered the driveway, appellant observed Stearns and Susan walk through the kitchen, and was upset because he did not expect to see Stearns there, and because Susan was dressed only in her nightgown. He grabbed his rifle and ran to the door. Appellant testified that it was then his intention to order Stearns out of the house, although the record is unclear with respect to whether he ever actually asked him to leave. He said he took the rifle because he felt Stearns was aggressive, even though he had never known him to act aggressively.

Susan testified Leitel was "angry" and "wild" when he entered the house, whereupon she grabbed the rifle, struggling with him three or four minutes, during which she received a badly cut hand. Appellant ordered Susan and Stearns to stand by a table in the kitchen; and while Stearns was attempting to calm the appellant, he asked, "What are you going to do? Kill me?" Appellant responded by threatening to kill all three of them, and, as Susan turned to go to the bathroom, appellant pulled the trigger, fatally wounding Stearns.

Appellant testified that he did not intend to kill John Stearns. He said:

"And Sue was standing by the bathroom door and I just thought, well, I will get the hell out of here. I want out. I backed up and John was coming toward me. He wasn't rushing but he was coming toward me. I backed over in this thing and sometime in here the gun went off."

Appellant had lived in the house for several years and in fact replaced the floor in the room in which John Stearns was shot. He testified at trial that, as he was backing out of the kitchen, he stumbled over a small ledge on the floor, slammed against the wall, and accidentally discharged the gun. Susan rushed in from the bathroom and saw Stearns lying on the kitchen floor. When she walked into the bedroom to tele-phone for help, appellant told her to stay away from the phone. She insisted, and was then permitted to use the telephone. After she made the call, Susan asked appellant why he had shot Stearns. She testified, "He said he didn't know. He just couldn't stand losing me." After the shooting, the appellant drove to the police station in Powell to turn himself in, arriving at the station sometime between 10:30 and 10:45 p. m. that night.

The evidence of record established that appellant was familiar with guns and knew how to use them. It was also shown that it was appellant's custom to put his rifle in a safety position when it was loaded and he did not intend to fire it. It was further established that the bolt was pulled back; the safety was off; and that the trigger had been pulled in the kitchen of Susan Lloyd's home on the night of February 2, 1977. An empty cartridge was found on the back porch of the house. Appellant stated that it was not necessary, for any of the purposes for which he intended to use the gun, for him to have had his finger on the trigger—to have had the safety off—or to have had a bullet in the gun.

### THE ISSUES ON APPEAL

The jury returned a verdict of guilty of second-degree murder upon which judgment was entered, and the court denied the motions for new trial and judgment of acquittal.

The questions assigned for our consideration are:

"A. Was the appellant's testimony arbitrarily rejected by the jury contrary to instruction number 17 and should appellant's motion for judgment of acquittal have been granted?

"B. Was there sufficient evidence of intent and malice to sustain a verdict of second-degree murder?

"C. Did the trial court err in refusing to give a certain instruction requested by appellant?" [From appellant's brief]

The trial court's judgment, as well as its order denying the appellant's motions, are

contrary to the position of the defendant-appellant on all of the above issues. We will affirm the trial court.

### ISSUE "A"

It is the contention of the defendant that the district court's judgment should be reversed since there is insufficient independent evidence of malice and intent to sustain the verdict under the dictate of the "Eagan Rule."[1] The Eagan Rule was embodied in Instruction No. 17 given by the court, as follows:

"You are instructed that where an accused is the sole witness of a transaction charged as a crime, as in this case, his testimony cannot be arbitrarily rejected, and if his credibility has not been impeached, and his testimony is not improbable and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted. The defendant has a right to testify in his own behalf and you must not arbitrarily reject his testimony simply because of the fact that his testimony was given in his own behalf."

The question is—Did the jury, in rendering its verdict, and the court, in entering judgment and overruling appellant's motions for acquittal and new trial, "arbitrarily reject" the defendant's testimony?

■ We said in *Doe v. State*, Wyo., 569 P.2d 1276, 1279, a second-degree murder conviction where the Eagan Rule was also contended for:

". . . In these cases, our duty is neither to substitute our opinion for that of the jury, nor to blindly accept the

jury's determination as correct. We are required, in order to sustain the conviction, to find that there is sufficient probative evidence, direct or circumstantial, to prove intent and malice[2] beyond a reasonable doubt. In doing so, we cannot—and will not—retry the facts of a case, but will only apply the rules set forth herein to the particular facts and circumstances which are presented." [Our footnote]

The Eagan Rule is, of course, helpful to a defendant only in those circumstances where his explanation remains uncontradicted either directly or by fair inferences from the testimony and evidence. *Cullin v. State*, Wyo., 565 P.2d 445, 448; and *Doe*, supra. Under the facts of this case, we cannot employ the Eagan Rule to negate the jury's finding of intent and malice.[3]

■ While we are bound to the duty of determining that intent and malice have been proved beyond a reasonable doubt, *Nunez v. State*, Wyo., 383 P.2d 726, 728, we must undertake our decision-making in an atmosphere furnished by other relevant directives. For example, the malice of which the crime speaks may be inferred from the use of a deadly weapon in a deadly manner, if the facts and circumstances will permit. *Smith v. State*, Wyo., 564 P.2d 1194, 1198; and *Doe*, supra. Malice may be inferred from all of the other facts and circumstances. *Eagen*; and *Doe*, supra. When deciding whether a set of facts call for reversal under the Eagan Rule, we must invoke the concept reannounced in *Doe*:

". . . In considering the evidence before us, we must accept as true the evidence favorable to the prosecution and give the State the benefit of every favor-

1. The so-called "Eagan Rule" is taken from *Eagan v. State*, 58 Wyo. 167, 198, 128 P.2d 215, 226 (1942).

2. In *Nunez v. State*, Wyo., 383 P.2d 726, 729, we approved the following definition of malice:
". . . The term, as used in the law of homicide, has often been defined as the *intentional* killing of a human being by another, without legal justification or excuse and under circumstances which are insufficient to reduce the crime to manslaughter. 26 Am.Jur., Homicide, § 40, pp. 183–184. See

also *State v. Ogilvie*, 180 Or. 365, 175 P.2d 454, 459; and *State v. Myers*, 248 Iowa 44, 79 N.W.2d 382, 390."

3. Section 6–4–104, W.S.1977 [Laws 1890, ch. 73, § 16; § 6–55, W.S.1957], provides:
"Whoever purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life."

able inference which may be reasonably and fairly drawn. *Cullin v. State*, Wyo., 565 P.2d 445, 448. . . ."

In denying a reversal under the Eagan Rule, by holding, as we do, that there was other and sufficient evidence of malice and intent, and, therefore the jury did not "arbitrarily reject" the defendant's testimony, we come to our conclusion in the presence of the following evidence:

Assume, arguendo, that Leitel did not know Stearns was at Susan's home when he entered the driveway and, therefore, did not go there to hunt him down. The record, nevertheless, reveals that he saw Stearns with Susan in her nightgown when he arrived in his pickup, and this admittedly upset him. He grabbed his loaded rifle while in this state of mind, and even though he said that he only intended to order Stearns out of the house, the jury was free to reject this testimony in view of what admittedly happened afterward, and in light of Leitel's own testimony that he had never known Stearns to behave aggressively. Appellant's intention to use the rifle against Stearns with malice could have been (and we assume was) concluded by the jury from further facts having to do with his refusal to give the gun up in his struggle with Susan—his statement to Stearns that he was going to kill him—the fact that he did kill him—and his statement to Susan afterward that he guessed he did it because he "couldn't stand losing me." (Susan's testimony)

Assuming, as we do, that the jury chose to accept this evidence, together with the proof of other material and relevant circumstances surrounding the incident, it was, indeed, sufficient to discredit the defendant's testimony about the accidental discharge of the gun and support a conclusion that the shooting was done with purpose and malice. We cannot, therefore, say, as a matter of law, that appellant's version of the shooting remained unimpeached by other and credible evidence—a condition precedent to a reversal under the Eagan Rule.

## ISSUE "B"

By reason of his Issue "B," the appellant seeks reversal on the theory that there was insufficient evidence of intent and malice to sustain a verdict of second-degree murder.

In our discussion of Issue "A," we have thoroughly covered the question, and, having found that there was adequate evidence of malice, there is no need to further belabor the issue.

## ISSUE "C"

According to his third issue, designated "C," the appellant urges error on the ground that the court should have given the following instruction:

"You are instructed that if a crime is as consistent with guilt of a lessor [sic] crime as it is with the guilt of a higher crime, the conviction should be of the lessor [sic] crime."

The defendant did not properly object to the court's failure to give this instruction. Rule 51, Wyoming Rules of Civil Procedure, states in part:

". . . No party may assign as error the giving or the failure to given an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. . . ."

■ We have repeatedly held that the voicing of general objections to instructions is tantamount to no objection at all, and we have denied appellate review where defense counsel has failed to specifically state the grounds for his objection. *Reeder v. State*, Wyo., 515 P.2d 969, 972; *Heberling v. State*, Wyo., 507 P.2d 1, 5, cert. den., 414 U.S. 1022, 94 S.Ct. 444, 38 L.Ed.2d 313. We have said so many times that the citations no longer require repeating that the reason for the rule is to give the court a timely opportunity to correct instruction errors before it is too late. It is counsel's duty to make a *specific legal objection* to a refused instruction if he would rely upon the claimed error on appeal. The record in this case clearly shows that counsel's objection was general

and not specific. With reference to the criticized instruction, counsel said:

> "Defense would take exception that instruction no. B was not accepted by the court and was refused."

This is no objection at all!!!

 The trial court's refusal to give the aforesaid instruction to the jury does not constitute plain error under Rule 49(b) of the Wyoming Rules of Criminal Procedure, or under the criteria set forth by this court in *Hampton v. State*, Wyo., 558 P.2d 504, 507. Furthermore, the appellant does not argue the plain-error doctrine on this appeal.

For the reasons stated, we cannot consider the alleged error, absent timely specific objection or the presence of plain error. In this appeal, neither is present.

Affirmed.